## DENVER & S. L. RY. CO. v. MOFFAT TUNNEL IMPROVEMENT DIST. et al.

District Court, D. Colorado, at Denver. September 20, 1929.

No. 8859.

Smith, Brock, Akolt & Campbell, of Denver, Colo. (Hughes & Dorsey, of Denver, Colo., of counsel), for plaintiff.

Rothgerber & Appel and Grant, Ellis, Shafroth & Toll, all of Denver, Colo., for Interveners.

Montgomery & Myer and Horace Hawkins, all of Denver, Colo., for defendants.

### The Issues.

SYMES, District Judge. In brief, the allegations of this bill are that on January 6, 1926, plaintiff railroad, and defendant the. Moffat Tunnel Improvement District, acting by and through the commission, entered into a written contract or lease, whereby the district leased to the plaintiff for a term of 50 years the railway use of the Moffat Tunnel and certain other property, with an option to renew for 49 years more; that the rent agreed to be paid is 66⅔ per cent. of the installments of the principal of the Moffat Tunnel bonds of $6,720,000, and so-called Moffat Tunnel supplemental bonds of $2,500,000, being all the bonds then authorized or issued, plus 66⅔ per cent. of the interest on the said two issues of bonds, beginning on the date the tunnel is ready for use by the railroad; that the plaintiff agreed to maintain the railroad tunnel, pay two-thirds of the cost of the commission, and, further, if the commission found it necessary to incur an indebtedness in addition to that above specified, or to levy and collect an assessment, proceeds to be expended on the railroad tunnel, the lessee bound itself to pay, in addition, the interest on such indebtedness as the same accrues, and to repay the principal in ten equal installments, beginning. January 1, 1974, or so much of the said sum as was expended on the railroad tunnel, provided, however, that this additional payment shall not in any event exceed $1,000,000 and inter-

est; that plaintiff went into possession under the lease and is now operating the railway tunnel as part of its system; and it is alleged that on March 25, 1927, the parties entered into a supplemental contract containing certain modifications of the original lease, not material here.

It is further alleged that the defendant tunnel commission is now claiming as rent a large sum in addition to that specified in the contract, and has served a notice upon the plaintiff, dated January 29, 1929, that the rent called for by the Moffat Tunnel District law was the fair and just proportion of an amount sufficient to pay interest on all the bonds outstanding, and to provide for their retirement; that the railroad was in default of payment thereof, and unless this large increased sum was paid, it would proceed to oust the railroad under the forfeiture clause of the lease; that in reliance upon the lease the plaintiff has caused large sums of money to be expended on its own railroad, has mortgaged its property, expended large sums of money looking to the construction of the Dotsero cut-off, and otherwise changed its position, which it would not have done if the defendants' claims had been seasonably made. Plaintiff prays that its title in and to the leasehold estate in the tunnel be quieted; that the lease be declared valid; and for injunctive and general relief.

Defendants, the improvement district, and the commissioners individually, admit the execution of the lease, and allege that it violates the Constitution and laws of Colorado, particularly section 9, chap. 2, of the Moffat Tunnel Act (Laws 1922, Ex. Sess., p. 99), and is without consideration; that they have demanded an additional sum as rent, and unless restrained will attempt to collect the same. They allege the rent specified is less than that required by the act, and that the lease creates a monopoly of the railway use in favor of plaintiff, in violation of the act. They deny plaintiff is in possession of the tunnel under the lease, but allege it is using the tunnel by the will and sufferance of the district, and is liable for the reasonable value of the use and occupation, and is indebted to the district in the sum of six hundred twenty-eight thousand odd dollars in addition to that paid. They admit the service of the notice and demand. They deny that the plaintiff has in good faith spent large sums of money and done other acts to its detriment in reliance upon the contract.

The second defense is that when the lease was negotiated and signed both parties believed the cost of the Moffat Tunnel would not exceed $9,720,000; that by reason of unforeseen conditions and contingencies the final cost of the tunnel amounted to $15,470,000, and that bonds in the amount of $5,750,000, in addition to the $9,720,000 aforesaid, were necessary to complete the tunnel; that the rent specified in the pretended contract was not a just and fair proportion of the amount required to pay interest and principal on the cost, etc., and should be not less than $850,000 a year; that due to a mistake of law the pretended determination of the value of the uses by the commission, as required by said section 9 of the act, was not a compliance therewith; that for all these reasons the contract is illegal and unconstitutional, at least as to the amount of rent to be paid; and asks that even if the lease be sustained, the court require the plaintiff to pay not less than $850,000 a year as rent.

The third defense is that the contract was without consideration, in that the railway is only bound to pay rent in the event it chooses to occupy and use the tunnel. Defendants next set up a counterclaim, alleging that the proportion of the value of the railroad use is 87 per cent. of the total value of all the uses of the tunnel. The defendants ask that the lease, or so much thereof as attempts to fix the rent for the use of the tunnel; the provision therein contained, authorizing the plaintiff to sublet; that part which attempts to create a monopoly in favor of the plaintiff; and the entire instrument—all be held null and void.

In reply plaintiff alleges that the contract is in full compliance with the law, and that the rent was the figure determined by the commission in accordance with the statute; that the defendants turned the railroad tunnel over to the plaintiff without questioning the validity of the lease, and the tunnel is being used pursuant to said lease; that the defendants remained silent, and at no time previous to January, 1929, did they in the slightest way intimate that they would assert any of the claims now set up in the answer and counterclaim; that by reason thereof the defendants are estopped from asserting the invalidity of the lease, or claiming any rental other than that specified in the contract.

### The Facts.

A brief summary of the material facts found, with a few comments thereon, is necessary to an understanding of the law of the case.

The record compels the conclusion that at no time did the commission or its engineers have sufficient data or information upon which a reliable determination of the completed cost of the tunnel could be made. It relied apparently wholly upon estimates of cost made by its engineers, that proved inaccurate and unreliable, both as to time of completion and cost, being millions of dollars under the actual figures. The organization set up was unable to solve efficiently and economically the problems presented by the areas of great pressure, fissures, soft rock, excessive flows of water and mud, etc. Several different methods of getting through this country were tried in turn and discarded, after great expense had been incurred thereby.

The preliminary examination of the site was merely cursory. The few drill holes and test pits dug were superficial, and the meager preliminary data gathered was wholly inadequate as a basis for an accurate forecast of the character of the ground, the engineering, and geological conditions that might be anticipated.

■ Mr. Lewis and Mr. Cohig, conscientious and industrious gentlemen, lacked the experience and qualifications necessary to efficiently and economically undertake and carry through to a successful completion a work of this magnitude. Mr. Lewis testified he was not an engineer; that he had had some experience in mining, but no training calculated to qualify him for the responsibility placed on him by the commission. He gained experience as the job proceeded. Mr. Cohig, his assistant, a young man of energy and ability, and a very recent graduate from the state university, had had no opportunity or experience to fit himself for his duties. Moreover, the board of consulting engineers, as is often the case, did not give sufficient time to the work to justify their employment. Their visits to the tunnel were infrequent and hurried, and their reports disclose that they relied to a considerable extent on the statements of the resident engineers, whose work they were supposed to check, and too little on first hand information. At no time previous to the holing through of the water tunnel was the commission justified in entering into leases for the use of the railway tunnel, based on the assumption that the cost was a known factor. But even so, at the time the contract was executed and very shortly thereafter, the progress so far made and the reports of the consulting board clearly indicated that the funds then on hand were insufficient to complete the work. The tunnel was finally completed, but at a tremendous cost, which to a considerable extent could have been avoided.

The evidence requires these conclusions. The evidence is very meager on this branch of the case, and if the court is in error, it is due to the failure of the members of the commission to testify as to matters peculiarly within their knowledge. The final responsibility was on the commission, and the failure of the job, financially, cannot be shifted to their subordinates, the lessee, or the court.

## The Law of the Case.

The Moffat Tunnel Act, by which the legality of this contract must be tested, is chap. 2, p. 88, of the laws passed at an extraordinary session of the Twenty-Third General Assembly of Colorado, convened April 18, 1922. The object of the act, as declared by the Legislature, is to provide an avenue of communication by means of a transportation tunnel through the Continental Divide, at or near James Peak, and to facilitate communication at all seasons of the year between the western and eastern portions of the state. Section 2 creates the Moffat Tunnel Improvement District and declares it to be a body corporate under the laws of Colorado; that the district shall comprise the entire city and county of Denver, Grand, Moffat, and Routt counties, and those portions of Eagle, Gilpin, Boulder, Adams, and Jefferson counties that border the line of the so-called Moffat Railroad. It provides for the management of the district by a board of five members, and contains all necessary provisions for their appointment and election, and other appropriate provisions not material to this discussion.

Section 6 directs the commission to provide for the construction of the transportation tunnel, its equipment and approaches, prescribes the elevation and location of the eastern and western portals thereof, and that it shall be so constructed that it may be used for standard guage railroads, transmission of power, telephone, and telegraph lines, transportation of water, automobiles, and other vehicles.

Section 8 grants the commission plenary power to do all that is necessary in and about the construction, operation and maintenance of the tunnel, with full power to enter into and execute all contracts, leases, and other instruments necessary to carry out the objects of the act; and, as stated in subdivision (h), section 8, of said act, the Leg-

islature vested the commission with all powers requisite and necessary for the accomplishment of the purposes for which the district was organized, and capable of being delegated by the General Assembly. The act contains no limitations as to cost.

In the Milheim Case, 72 Colo. 268, 211 P. 649, the state Supreme Court passed upon numerous and varied objections to the Moffat Tunnel Improvement District and the act creating it, several of which are raised here. That court held the district to be properly organized, the act valid and constitutional in all respects, including the taxing provision; that the district is a municipal corporation; and that there was no lending of the public credit. On appeal the Supreme Court of the United States affirmed the state court. 262 U. S. 710, 43 S. Ct. 694, 67 L. Ed. 1194. Both held the tunnel was for a public purpose, for the reason, among others, that the uses were available to all on substantially the same terms, and the Supreme Court of the United States held that the tunnel was a public use and benefit, even though constructed for the sole benefit of the plaintiff railroad.

Section 9 is the vital section of the act so far as this controversy is concerned. It empowers the commission to lease the uses of said tunnel for not more than 99 years to persons or corporations, etc., for transmission of power, telephone and telegraph lines, the transportation of water, and for railroad purposes, and directs that the tunnel shall be put to the largest number of uses consistent with the purpose for which the improvements are constructed. The railroad use was only one of several that the Legislature had in mind.

■ The balance of this section prescribes the terms on which leases of the several uses shall be made, and contains certain limitations in the nature of conditions precedent on the otherwise plenary power vested in the commission in this respect. The latter are that the commission shall first determine the value of the separate and different uses to which the tunnel is to be put, and apportion the annual rentals and charges according to the respective values of such uses, bearing in mind that the tunnel is to be put to the largest possible number of uses. This language is clear, requires no interpretation, and is susceptible of only one construction. The value of each use and the rent to be derived therefrom may be divided among several lessees of each use. The capacity of each use is the only limitation on the number of lessees thereof.

■ The next limitation is that no lease shall be made until and unless the lessee binds itself to pay as rental an amount determined by the commission and specified in the contract, which shall be "a fair and just proportion" of the total amount required to pay interest on the bonds provided for in the act, plus a just proportion of the amount necessary for their retirement, plus the cost of maintenance of the tunnel, its approaches and equipment. This language does not specifically fix the amount of such rent, nor does it require that any one lessee shall pay the total of the charges enumerated, or that the cost is a factor. In fact, nowhere in the act is cost or any limitation thereon mentioned. "A fair and just proportion" is, of course, a part of the whole, and its determination necessarily involves the exercise of a wide discretion. It is a matter of judgment not capable of exact determination by the commission or any one else. Any specific determination by the commission may comply with the statute, notwithstanding that another commission, other individuals, or a court, might make a different finding, and the former cannot be upset unless shown to be fraudulent, capricious, or lacking in good faith. The commission in making this determination exercises functions of a semijudicial nature, as distinguished from those denominated ministerial. If it was the intent of the Legislature that the lessee of the railroad use should pay the entire cost of the construction and maintenance of this tunnel, including interest, it would have been very easy for it to have said so in no uncertain terms.

Section 9 also authorizes the commission to require such leases to be entered into before the beginning of the construction of the tunnel, or the expenditure of any funds, if in its judgment it is deemed expedient. The concluding clause of this section is significant. It declares that the judgment and action of the commission on all matters referred to in this section shall be final, except as specifically in the act limited. This creates an additional presumption in favor of the correctness of the commission's actions in this regard, and casts the burden of proof on those who would question it.

■ On December 23, 1925, just prior to the making of the lease, the commission made a determination of the respective values of the railway and water uses, and fixed the amount of the rent. This action was taken long before the total costs and maintenance charges could be determined. At this time the only bonds provided for or mentioned

in the act, to wit, $6,720,000, had been sold, together with the first issue of so-called supplemental bonds. Without in any way expressing an opinion upon the validity of the so-called supplemental bonds, it is clear that the language of section 9, "bonds provided for in this Act," refers to the $6,720,000 of bonds authorized by section 10. Yet it is not questioned, nor could it be successfully, that the commission had full power to make these determinations and enter into a lease at the time it did. The validity of the determinations made by the commission as to the value of the uses and the rent to be paid did not depend upon, and need not await, the ascertainment of the final cost of constructing the tunnel. The Legislature did not require the impossible. To admit that the commission had the power to determine these conditions precedent and enter into a binding contract in advance of the completion of the tunnel, and then argue that the contract is invalid because it now appears the cost exceeded the estimate of the commission made at the time, is illogical and unsound. The Legislature never intended that the validity of any lease should depend upon the commission guessing—and that term is used advisedly—at its peril, or that of the lessee, the exact cost of the tunnel. If any doubt of this exists, it is settled by section 13, providing that if the revenues from the use of said tunnel (necessarily meaning the rents) are not sufficient to pay the interest as it becomes due in any year on the bonds issued under the provisions of the act, and to provide for their retirement at maturity, and for the expenses of the commission and the maintenance of the tunnel, etc., then, to prevent a deficit, it shall be the duty of the commission to levy special assessments, etc., sufficient in amount to pay the interest and provide for the retirement of the bonds—a wholly unnecessary provision if the rent was to pay all charges or if the cost was thought capable of exact determination. The Milheim Case, 262 U. S., supra, refers to the fact that the act contemplated an assessment if the rent was not sufficient to pay the interest and principal, etc.

But even if, in the light of subsequent events, the commission were guilty of a mistake of judgment, it is no indication that section 9 was violated. The Legislature vested plenary powers in the commission, required it to build the tunnel at a particular location regardless of cost, and gave notice to this and other courts that its judgment, when honestly exercised within its delegated powers, is final.

Exhibit 5 fully discloses the manner in which the commission made these determinations. According to its minutes and resolutions, exhaustive investigations were made preliminary to fixing the value of the uses and the rent. The recitations are full and complete, and an exhaustive report of the president of the commission on these questions was before it at the time it acted. Boards of this character are not bound by the rules of evidence that obtain in courts generally, and it has been decided that it is proper for such a tribunal to act upon any information they deem proper, or upon knowledge which the members themselves happen to possess. The act does not require the commission to hold hearings, nor is any procedure prescribed, and none is necessary in making determinations of this question. Northern Pac. R. Co. v. Traill County (Railroad Tax Cases) 115 U. S. 610, 6 S. Ct. 201, 29 L. Ed. 477.

We have a unique situation. The commission is here attacking its own acts. One of its members testified that it did not make a legal determination of the value of the respective uses. Nevertheless the full recitals of the minutes of the commission of December 23, 1925, affirmed January 6, 1926, and signed by all of the commissioners, and the recitals in the lease, create a presumption in favor of the written record that must prevail.

### Mistake of Fact.

The defendants in their second defense allege that because of a mutual mistake of fact the rent provisions of the contract are invalid; that during the negotiations leading up to the lease both parties believed the cost of construction of the tunnel would not exceed $9,720,000; that this was the basis they dealt on; that it constitutes in law a mistake of fact, because, due to unforeseen conditions and contingencies unknown to both parties on January 6, 1926, the final cost was $15,470,000, and that as a result thereof the rental agreed on is "not a fair and just proportion" of the amount required to pay interest and to retire the bonds.

As already pointed out, the commission believed on January 6, 1926, rightly or wrongly, that the tunnel could be built for the sum first named, and fixed the rent accordingly. It is not denied that the rent named in the lease is "a fair and just proportion" of the bonds then outstanding. Furthermore, the record fails to support the allegation of mutuality of this alleged mistake. It was the duty of the commission to

keep informed of costs and progress, so far as might be. The lessee, however, was in a different position. It had nothing to do with the work and had no official sources of information. While the plaintiff was in law charged with notice of the powers of the commission, it was not required at its peril to check costs, or pass upon the manner in which the commission exercised its powers. The lessee had the right to believe it was dealing with a board capable of properly and intelligently managing the affairs of the district, and was free to obtain the most favorable terms that it honorably could. The plaintiff's direct liability amounts to over $18,000,000· plus maintenance and other expenses. The charge that the rent is unconscionable is without foundation.

The contract itself discloses that the parties felt that the final cost was problematical. The lease provided that in the event there was any surplus remaining in the hands of the commission, after completion of both tunnels it should constitute a trust fund, to be used for improvements and to redeem bonds, to that extent reducing the rent. As already stated, if the cost exceeded the estimates, the lessee was to pay an additional sum as rent, which might amount to as much as $1,000,000.

█ A mistake of fact, to constitute a ground for setting aside a contract in equity, must be a mistake of a past or present fact that is the subject of the contract and one capable of exact ascertainment, as distinguished from the inducement. The so-called mistake of fact here in question, by the very nature of things, was, at the time the contract was entered into, merely an estimate, impossible of ascertainment and dependent on future events. The requirement of this rule is not met by an allegation and showing that the parties labored under a misapprehension as to the cost of the tunnel. Defendants must go further and show that such misapprehension or mistake, if it was such, was not due to their negligence. So, whether the real cost was at the time incapable of determination, or, if being capable of determination, the board failed to figure it correctly, the rule invoked does not apply.

█ This principle of equity, variously stated by text writers and decided cases, is, due to the great variety of situations to which it is applied, incapable of exact definition. For the present application, however, it may be stated that where parties treat on the basis that any material fact which is the subject of the agreement is doubtful, and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid, notwithstanding any mistake of one of the parties. A few of the many authorities in point are:

13 C. J. p. 376, § 261.

Dambmann v. Schulting, 75 N. Y. 55, at page 64: "There are many extrinsic facts surrounding every business transaction which have an important bearing and influence upon its results. Some of them are generally unknown to one or both of the parties, and if known might have prevented the transaction. In such cases, if a court of equity could intervene and grant relief, because a party was mistaken as to such a fact which would have prevented him from entering into the transaction if he had known the truth, there would be such uncertainty and instability in contracts as to lead to much embarrassment. As to all such facts, a party must rely upon his own circumspection, examination and inquiry; and if not imposed upon or defrauded, he must be held to his contracts."

And in Pomeroy, vol. 2, p. 1707, we find this statement:

"Equity will not relieve a person from his erroneous acts or omissions resulting from his own negligence."

"Mistake therefore within the meaning of equity * * * is an erroneous mental condition induced * * * by misunderstanding of the truth but without negligence."

See also Cavanagh v. Tyson, Weare & Marshall Co., 227 Mass. 437, 116 N. E. 818.

In Chicago & Northwestern Railway Co. v. Wilcox· (8th C. C. A.) 116 F. 913, at page 914, the court says: "Again, it is not every mistake that will lay the foundation for the rescission of an agreement. That foundation can be laid only by a mistake of a past or present fact material to the agreement. Such an effect cannot be produced by a mistake in prophecy or in opinion, or by a mistake in belief relative to an uncertain future event."

█ Surely no one can say there was no risk involved in estimating the cost, or that any estimate was not at the best doubtful. Defendants' counsel, with commendable frankness, state the cost was a very uncertain element. Furthermore, it is the law that where a party enters into a contract, ignorant of a fact, but meaning to waive all inquiry into it, or waives an investigation after his attention has been called to it, it is not a mistake in the legal sense. These limitations are predicated upon common experience that if people contract under such circumstances, they usually intend to abide the res-

olution either way of the unknown uncertainty, and have insisted on and received consideration for taking the chance. As has been shown here, the plaintiff and defendants had in mind the chance of a variation in cost and provided for it.

In the argument the defense of mistake of law was not seriously pressed, and does not require discussion.

### Determination of Value of Uses.

■ These defendants, in again attacking one of their own acts, say that if it is held, in spite of their contention to the contrary, that they did make a determination of the value of uses as required by the section, they were in error in placing the figures at one-third and two-thirds for the water and railroad uses, respectively, and, as a matter of fact, the value of the railway tunnel is at least 87 per cent. of the total value of all the uses, and the court should adjust the rent accordingly. But this again is a question of judgment as to whether 66 per cent. or 87 per cent. is the proper figure, and, the commission having acted, it is not within the power of the court to change it.

The act discloses the Legislature expected great benefits to result from the construction of a conduit capable of transporting water through the Continental Divide to the eastern slope. This belief influenced the elevation and location of the tunnel, and, in considering the value of the water use, we must bear in mind that the future agricultural development and increase in population and wealth of the eastern half of Colorado at least, is limited only by the amount of water available for beneficial use. We need only refer in this connection to the controversy and discussion centering for years around the Colorado river and Boulder Dam project, the seven-state compact, and the interstate litigation over the waters of the streams originating in Colorado.

### Estoppel.

■ We now come to the plea of estoppel and ratification made by the plaintiff in answer to the allegations of invalidity of the contract. This defense has no application here for two reasons: First, there is no evidence of any acts or conduct on the part of the commission that brings it within the rule. All that the defendants did subsequent to January 6, 1926, was to proceed under the belief, as did the plaintiff, that the lease was valid in all respects. Plaintiff's allegation is, in effect, that the defendant commission took the same alleged erroneous view of the

act that it did. Both were evidently of the same opinion at the time the supplementary contract of March 25, 1927, was entered into. There were no overt acts upon defendants' part in the way of representations, statements, conduct, or dealings with the railroad that induced the latter to change its position, or that in equity constitute grounds of estoppel. The defendants had nothing to do with the issue of bonds by the railroad company, the expenditure of large sums of money in improvements on its own property, or with the Dotsero cut-off negotiations. These were acts of the railroad company, done on its own initiative and wholly outside of the contract; that is to say, while the railroad company may have done them as a result of having obtained the lease, they were not required by the terms thereof nor induced by defendants.

■ Secondly, the plaintiff was dealing with a public corporation, a creature of statute, the powers and limitations of which were clearly stated in the act, and it was required to take notice thereof at its peril. Contracts of a public corporation which are ultra vires in the proper sense, that is, beyond the powers conferred upon it by the Legislature, are wholly void and of no effect.

To establish the validity of a municipal contract, it must appear that the city has followed strictly the legislative provisions conferring the power where they involve the right or power of the city to make the contract. 44 C. J. p. 70, § 2126.

Jacksonville, Mayport, Pablo Railway & Navigation Co. v. Hooper, 160 U. S. 514, at page 524, 16 S. Ct. 379, 383, 40 L. Ed. 515, holds that: "A contract of a corporation, which is ultra vires, in the proper sense,— that is to say, outside the object of its creation, * * * therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect * * * cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity."

See also Central Trans. Co. v. Pullman's Car Co., 139 U. S. 24, 11 S. Ct. 478, 35 L. Ed. 55.

■ One of the essential elements to entitle the holder of an obligation of a public corporation to invoke against it the doctrine of estoppel is that such holder has been misled to his disadvantage by reason of the acts or conduct relied upon. Merely showing some act or conduct by the defendant in recognition of the validity or binding effect of the

contract will not create an estoppel where it is not also shown that this conduct has misled the other party to the contract or obligation to his disadvantage.

The first question to be determined in a particular case is whether or not the invalidity of the instrument is due to the entire lack of power of the corporation to enter into it, or merely to an irregularity in the exercise of a delegated power. If it is the former, no matter what may be the nature of the instrument or the character of the estoppel relied on, the instrument is unenforceable. On the other hand, if the invalidity is due to some irregularity in the exercise by a public corporation of a granted power to contract, frequently the instrument may be enforced through the application of the doctrine of estoppel or ratification on the theory of quantum meruit or implied contract.

See Hagerman v. Town of Hagerman, 19 N. M. 118, 141 P. 613, L. R. A. 1915A, 904, and notes.

In Oklahoma v. Texas, 268 U. S. 252 at page 257, 45 S. Ct. 497, 499, 69 L. Ed. 937, the Supreme Court said: "Only where conduct or statements are calculated to mislead a party and are acted upon by him in good faith to his prejudice can he invoke them as a basis of such an estoppel. And if they relate to the title of real property 'where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.'"

In such a situation municipal corporations cannot through their officers or otherwise, estop themselves from questioning the legality of any provision on the ground that they have some legal authority to enter into the agreement in question.

In Scott County, Ark., v. Advance-Rumley Thresher Co., 288 F. 739 (8th C. C. A.) it is said, page 748:

"'A municipal corporation may ratify the unauthorized acts and contracts of its agents or officers which are within the scope of the corporate powers, but not otherwise.'"

"If the contract was one beyond the power of a county under any circumstances to make, then the keeping and using of the machinery would not constitute an estoppel, and the act of the county * * * could not be ratified."

Any limitation upon the power of the district to contract, contained in the act, must be read into the terms of the lease. 44 C. J. p. 130, § 2223.

Municipality not estopped by acts in violation of law, or without legal authority. World Realty Co. v. Omaha, 113 Neb. 396, 203 N. W. 574, 40 A. L. R. 1313; People v. Detroit, G. H. & M. R. Co., 228 Mich. 596, 200 N. W. 536; 10 R. C. L. p. 705, § 32, and p. 708, § 36; 44 C. J., p. 68, § 2125; 21 C. J. p. 1194, § 194; p. 1214, § 218. This rule seems to be equally applicable to contracts performed in part as well as those purely executory.

The Moffat Tunnel commission derives its powers from the statute, and could only bind the district in strict accordance therewith. A municipal corporation cannot, like an individual, ratify or alter a contract of its own will, with the consent of the other party. The illegality of a municipal contract may be raised at any time, and any alleged ratification or alteration is subject to the same test as the original contract.

Donnelly on The Law of Public Contracts states (section 56) that where a public contract is valid in part and ultra vires in part, such invalidity will not ordinarily affect the other provisions or parts of the contract which are in no way dependent upon the invalid part or provision, and the valid part may be enforced, while that which is illegal and invalid may be rejected. See also Kimball v. Cedar Rapids (C. C.) 100 F. 802; City of La Follette v. Water Works (C. C. A.) 252 F. 762; 44 C. J. p. 121, § 2223.

But the case before us does not turn upon the general law as to whether the valid parts of the contract can be enforced, and those which are illegal rejected. This contingency was covered by the Legislature in section 22 of the act, and provided for by the contracting parties in section 11, art. 3, of the lease. But these provisions do not nor is there any rule of law that authorizes the court to make a new contract for the parties.

### Monopoly.

Section 9, second paragraph declares: "There shall be no monopoly in the use of said tunnel and its approaches by any one use, or by any person or corporation, private or public, in respect to the several uses, and the Board may continue to make separate and additional and supplemental contracts for one or more uses until, in the judgment of said Board, the capacity of the tunnel and approaches for any such use has been reached." This, plainly, is a limitation on the power of the commission to be kept in mind by all parties in making leases. This language and that immediately following says, in effect, that the commission cannot grant preferential rights, contract away, or

limit its freedom to contract with as many lessees for any one use on such terms as in the judgment of the commission is deemed advisable, up to the capacity of the particular use.

Then follows certain limitations on this otherwise full power of the commission to contract with subsequent lessees, some of which run in favor of prior lessees. They are that subsequent contracts shall be subject to all existing and prior contracts; that the commission shall have power to prescribe regulations for the use of such tunnel by the parties to contracts for such use, and to hear and determine all controversies which may arise between such parties; that all contracts may be assigned or subleased, provided the original contracting party shall not be thereby relieved from his obligation; and, further, that subsequent leases or contracts for the same use must provide for the reimbursement to the prior users of an equitable proportionate amount thereof, paid for the retirement of bonds, including interest, said amount, however, to be determined by the board. This provision automatically reduces the rent of prior lessees.

These so-called powers and limitations, however, are to be exercised by the commission from time to time as new leases are made, and cannot be anticipated, nor can the commission in any one contract limit its power to contract with subsequent lessees, except as in the act provided. It therefore follows that sections 2 and 6 of article 3, and section 10 of article 2 of the lease, for instance, and possibly a few other provisions, in so far as they attempt to restrict the powers of the commission in making subsequent leases, are void. Any attempt to give a private lessee the right to deal as a proprietor with other lessees would raise a serious constitutional question.

### Failure of Consideration.

Defendants contend there is a failure of consideration for the contract; that it is a mere option, binding on the district but not the lessee. What merit, if any, there may have been in these contentions at the time the contract was executed does not now exist, because the railroad has been placed in possession, is operating through the tunnel, and there has been a substantial part performance by both parties. Furthermore, the lessee has, by numerous acts, declarations, and conduct, acquiesced in by the district,

affirmed the binding effect of the lease for the full term. Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 S. Ct. 967, 57 L. Ed. 1410.

### The Petition of Intervention.

What has already been said is decisive of most of the questions raised in the answer of the interveners. Their allegations in respect to friendship, intimacy, and business connections between Mr. Hughes, some time officer of the plaintiff and one of its attorneys, and the members of the commission are insufficient in law and equity. As stated by counsel for interveners, such alleged influences, if they existed, were unconscious and were not exerted intentionally and did not involve fraud. Furthermore, no proof in support thereof was offered. Counsel for interveners have performed an unpleasant duty as officers of the court in calling attention to certain other relations between counsel for the commission and counsel for the plaintiff. It suffices to say, however, that they do not under the circumstances raise any equities one way or the other.

### Date of Completion.

As to the date of completion and occupation of the tunnel by the plaintiff railway the evidence is conflicting. The weight of it is that the tunnel was completed and ready for use on the date the first freight train went through, to wit, February 14, 1928, and it is so found. The railway says it entered into possession by virtue of section 8 of article II. But it had that right as of January 1st preceding, and yet did not avail itself of it.

There exists a difference of opinion among counsel as to the exact nature of this suit. Plaintiff asserts it to be an action to quiet title to its leasehold, while defendants assert it is an action for specific performance. It is unnecessary to decide the abstract question. With the exceptions noted the lease is valid and binding on both parties. Injunctive relief may be invoked against a landlord to protect the possession of his tenant, but as to the extent of time of the same I entertain considerable doubt at the present time. The court has power to enter a decree carrying into effect the views here expressed, the terms of which may require further discussion before it is finally settled.