# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

GEORGE W. FIX AND HENRY S. FIX, PARTNERS, ETC. V. EDLEY CRAIGHILL AND F. L. SHOWALTER, PARTNERS, ETC.

June 15, 1933.

Present, Holt, Epes, Hudgins, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*Caskie, Frost & Coleman,* for the plaintiffs in error.

*Harrison, Long & Williams, Aubrey E. Strode* and *Volney E. Howard,* for the defendants in error.

EPES, J., delivered the opinion of the court.

Edley Craighill and Fred L. Showalter, partners under the name of Craighill and Showalter, brought their action (instituted by a notice of motion for judgment) against George W. Fix and Henry S. Fix, partners under the name of J. A. Fix and Sons. The parties will be referred to herein as plaintiffs and defendants as they appeared in the trial court. The action is brought to recover $2,115.38 which the plaintiffs as subcontractors claim to be due to them from the defendants "for work done, materials furnished and labor performed" by them for the defendants. The

bill of particulars filed with and made a part of the notice divides the amount demanded into two items as follows:

"Item 1. Balance due plaintiff by defendants for concrete work, including labor and materials, done in construction of shop improvements for the Chesapeake and Ohio Railway Company at Clifton Forge, Virginia, under the written contract made between the plaintiffs and defendants dated October 10, 1930, ...................... $1,870.00

"Item 2. Balance due plaintiffs by defendants for sundry other items, for labor and materials furnished and work done by plaintiffs for defendants, on account settled and agreed to between them, ...................... $245.38."

The defendants admitted that they owed the plaintiffs $242.38, and paid this amount into court. As to the residue of the amount sued for ($1,873.00) the defendants make three defenses, which are set forth in their grounds of defense filed under the general issue and also in the special pleas filed by them, the material parts of which pleas read:

(1) "There was a failure of consideration as to $1,878.00 of the amount sued for."

(2) "The defendants say that in making the contract referred to in the notice of motion, it was specifically understood and agreed that the price given by plaintiffs for the work to be done was to include certain work and materials for certain concrete work, which was in fact omitted and not required to be done, and that the parties had specifically agreed that work added to or omitted from the work contemplated was to be added to or subtracted from the contract price at the rate of $12.00 per cubic yard, and of the amount sued for the sum of $1,878.00 represents work contemplated but in fact omitted and not required to be done."

(3) "The defendants say that as to the sum of $1,878.00, claimed in the notice of motion, there was a mutual mistake made by plaintiffs and defendants as to the concrete work required to be done under plans and specifications referred to in the contract and that it was thought and mutually contemplated that certain concrete work, which

was not in fact required to be done, was to be done and that under the agreement of the parties additions and omissions from the work required to be done were to be added or subtracted as the case might require at the unit price of $12.00 per cubic yard, and defendants therefore claim that they are entitled to credit for the omission at the stipulated price, which would amount to the sum of $1,783.00."

The defendants demurred to the evidence; the jury returned a verdict for the plaintiffs for "$1,870.00 plus the further sum of $242.38, paid into court, with interest from June 24, 1931, subject to the opinion of the court on the defendants' demurrer to the evidence"; and the court entered judgment for the plaintiffs in accordance with the verdict. To this judgment the defendants have been granted a writ of error, and assign as error the action of the court in overruling their demurrer to the evidence.

The evidence, stated in the order of the sequence of the events disclosed by it, is as follows:

The Chesapeake and Ohio Railway Company asked for bids for a project designated as "shop improvements at Clifton Forge," the improvements to be made in accordance with designated plans and specifications and certain general conditions and requirements. The project included improvements to a number of the company's shop buildings, and called for doing of various types of work (brick work, concrete work, etc.) and furnishing the materials therefor, and was to be let as a whole. This case, however, involves only the concrete work to be done in connection with the improvement of a building known as the tank shop (which faces almost due east), and more particularly with the construction of three tracks which are shown on the plans as lying outside of, and in rear (west) of, the tank shop.

Among the plans and specifications were two sheets of drawings relating to the improvements to be made to the tank shop. One of these (designated as drawing number 9675-A1) showed the floor plan of the tank shop with three tracks extending through the building, and, according to

the scale, approximately fifteen feet beyond (east of) its rear wall. At the western ends of the tracks as shown on this drawing is the notation "see situation plan—drawing number 9676-A1 for length of tracks." Below the floor plan on drawing number 9675-A1 is a vertical cross section (section P-P) showing in detail the plan for the construction of the tracks. This cross section carries the notation "present concrete shall be removed for new track work," and shows a track laid in, or upon, a strip of concrete seven feet six inches wide and sixteen inches thick.

The other sheet of drawings, number 9676-A1, shows the "situation plan" of the tank shop and other buildings which are adjacent to or near it. The scale of this drawing is one inch equals fifty feet, and the legend on it states that "new construction" is shown in red. It shows the following features in the area which is contiguous to, and west of, the tank shop. Distances given by us are distances west of the western wall of the tank shop and have been determined by an accurate scale of the blue print of the drawing filed as a part of the evidence in this case. The eastern line of an alleyway, or roadway, runs parallel to, and approximately seventy feet west of, the tank shop. Across this alleyway is a building designated "freight car repair blacksmith shop." Abutting on the east line of the alleyway and extending eastward to a line approximately forty feet distant from the tank shop is an area (fifty feet long) which bears the notation "remove wheel storage platform and racks." Three railway tracks are shown in red as running through the interior of the tank shop and extending westward into the area west of it. Two of these extend across the area denoted "wheel storage platform and racks," to the east line of the alleyway above mentioned. The third passes to the north of the "wheel storage platform and racks," and extends westward along what appears to be an east and west alleyway, or roadway, for approximately 350 feet. The whole length of these tracks as shown both outside and inside the tank shop are in red.

Other than what is above stated, there is nothing in the plans and specifications to show whether any parts of these tracks outside the tank shop were required to be laid in concrete, or if any parts were required to be so laid, what the lengths of such parts were.

To lay the parts of these three tracks shown on drawing 9675-A1 in concrete would require the laying of approximately fifty cubic yards of concrete. To lay them in concrete from the tank shop to the east line of the "wheel storage platform and racks" would require approximately 133 cubic yards of concrete; to lay them in concrete to the east line of the alleyway would require approximately 233 cubic yards of concrete; and to lay them in concrete for their full lengths outside the tank shop as shown on drawing 9676-A1 would require approximately 550 cubic yards of concrete.

The specifications for the concrete work contained these provisions:

"The contractor shall furnish all labor, materials, tools and equipment necessary to entirely complete the concrete and reinforced concrete work shown or implied on the accompanying drawings.

"Any work paid for or deducted on a unit price basis shall be for the actual measured yardage and shall include the entire value of the sheeting, bracing, forms, etc., used in connection with the work."

The contract which was ultimately made between the railway company and the defendants for the completion of this project contained a unit price provision in accordance with which additions to and omissions from the work called for by the contract were to be settled for. The defendants submitted a "lump sum bid" to the Chesapeake and Ohio Railway Company for this project.

The plaintiffs and the defendants, both of whom were contractors, had their offices in the same room in the Lynch building in Lynchburg, Virginia. While the defendants were making their computations for the purpose of submitting a bid to the Chesapeake and Ohio Railway Company,

either George Fix asked Showalter to check the concrete work and give him a figure on it, or Showalter asked Fix if he did not want him to check the concrete work and give him a figure on it, and Fix told him that he would be glad to have him do so. Whichever way it came about, Showalter checked with George Fix the quantities of concrete work called for by the plans and specifications, made an estimate of the amount for which his firm would be willing to do the concrete work, and gave George Fix a pencil memorandum of this estimate. No legal obligations were entered into between the plaintiffs and defendants at this time; but both parties contemplated that, if the defendants secured the contract for this project and they and the plaintiffs could agree upon the terms of a subcontract, the defendants would sublet the concrete work to the plaintiffs.

Showalter's account of what took place between the parties with reference to the making of this estimate is this:

"He [George Fix] asked me to check the plans, and I told him the time was very limited and he and Henry were in the office together and they said 'suppose we show you about what there is to do on it, so you won't have to study them a long time,' to which I agreed and we went over the plans and they indicated to me the work they had figured, and I was figuring at that time simply as a check for them so they could tell about what they thought would be about the right amount to put in for the concrete work. I went over the plans and began to take the quantities, and when I got to the point in question where the red line shows or indicates these tracks going outside the tank shop, I called George in or I took the plans to him and I said 'George, did you figure on putting this concrete in out here (indicating)?' and he said 'yes, we figured putting the concrete in,' and I said 'I will figure on all of this,' and that was the entire conversation as far as I know. I went on and estimated the job, and laid a memorandum on his desk which was subsequently followed up by a letter for $16,400 and

something, and they said, 'that is fine, that is just about what I figured,' and I said 'if you get the job I will be glad to go into it with you further,' and he said 'all right.'"

At another place Showalter says that when he gave Fix the figure of $16,400 for the concrete work he told Fix "that that was a pretty close figure, and if he got the job we would go into the contract further."

George Fix's account of what took place is as follows:

"When we received the plans we took all the quantities, such as labor and different items, brick work, and there were quite a few units in the job, which the concrete was one of, and after we had taken the quantities off, Mr. Showalter asked me if I wanted him to give me a price on the concrete work, he asked me, in other words, if I wanted him to figure on the concrete work, and I told him I would be glad to have it. We already had taken the quantities off, and I told him I would be glad to have his price, which he gave us. At the time he started to take the quantities off, I don't know whether I suggested it or whether he did, but anyway we agreed to go over in estimating the quantities, and when we got to this item, in fact he heard us discussing it, my brother and myself, and we did not know whether to include the item or not. There was a section through the tank shop, I think on the plans, section 'SS' [should be PP], which showed a crosscut through it, and this work in dispute is outside the tank shop and while we thought that there should be a section on the outside, as I said, it was not certain and after much discussion we finally decided to include it in our price, and when Mr. Showalter estimated these quantities my brother was there and I was there, and he asked me about it, and I told him to go ahead and include it, and of course, I never once thought if it wasn't done we would not get a credit for it, and he did include it, and when we got to it, we found the work did not have to be done, and in fact, it wasn't done, and that is the whole story."

So far as the evidence discloses, from the time that Showalter gave Fix the $16,400 estimate until two weeks

or more after October 10, 1930, there was nothing said between the plaintiffs and defendants as to what, if any, concrete work for the tracks outside the tank shop was required by the plans and specifications.

In making up their "lump sum bid" on the whole project, the defendants used Showalter's figure of $16,400 as the component for the concrete work. The evidence does not show what was the amount of the defendants' "lump sum bid"; but whatever it was, it was submitted to the railway company in competition with other bidders, and the defendants were awarded the contract for the whole project at their bid.

After the defendants had been awarded the contract by the railway company, the plaintiffs wrote and handed to the defendants the following proposal in the form of a letter, and the defendants endorsed their acceptance thereon:

"October 10, 1930.

"J. A. Fix & Sons,
"City.
"Gentlemen:

"We agree to furnish all labor and material and do all concrete work as shown on plans and specifications for shop improvements for the C. & O. Railway Co., at Clifton Forge, Va., for the sum of Sixteen Thousand and 00/100 Dollars, ($16,000.00). This price does not include forms or reinforcing iron.

"We agree to do necessary earth excavation for the sum of ninety cents (.90c) per cu. yd. If rock is encountered add to this price two and 10/00 dollars ($2.10) per cu. yd.

"Payments to be made for 80% of work completed each month.

"Yours very truly,
"CRAIGHILL & SHOWALTER,
"By

"Accepted
"Oct. 10, 1930,
 "J. A. FIX & SONS,
 "By Geo. W. Fix."

The defendants did not ask for a bid on the concrete work from any persons other than the plaintiffs, and this contract was entered into between them without competitive bidding.

There is no evidence to show, and neither of the parties contend, that the reduction in the figures of the plaintiffs for the concrete work from $16,400 to $16,000 was because of the elimination from their calculations of any of the concrete work upon which Showalter had figured when he gave George Fix the estimate of $16,400. Both George Fix and Showalter testify that both of the parties to the contract here in question were at all times in doubt as to whether the plans and specifications required any parts of the tracks in rear of the tank shop to be laid in concrete; and neither party professed to know whether or not the plans called for such concrete work.

Over the objection of the plaintiffs George Fix was permitted to testify as follows:

"Q. Mr. Fix, will you please state whether or not there was any additional agreement in regard to what is put on here?

"A. There was an agreement as to unit price for omissions or additions which were not stated in there. I mean he did not have it in the proposal but it was talked of by us at the time he gave us the proposal. As I said, it was understood that there was to be a unit price for omissions or additions, which, quite frequently in handling things of that kind, we do not always—in fact, we have let work where we never had any proposal at all, but it is customary and he knows that the plans and specifications call for a unit price which he gave us verbally and which has been used for omissions and additions; and, as I say, the unit price was not mentioned in the letter and naturally there wasn't anything thought of it because the plans and specifications called for

it, and it was talked about at the time, and he gave us a price of $12 per cubic yard for any concrete omitted or added.

"Q. Did he subsequently give you a price of $12 per cubic yard?

"A. Yes, sir.

"Q. Were any additions and omissions made?

"A. Yes, sir.

"Q. Were they calculated and allowed at the unit price?

"A. Yes, sir, and we have bills covering all of them."

He also testified, over the objection of the plaintiffs, that under this unit price agreement between them, the plaintiffs and defendants had settled on the basis of $12 per cubic yard for 46.05 cubic yards of additional concrete work and 12-2/3 cubic yards of omitted concrete. None of this additional or omitted concrete had any connection with the tracks in rear of the tank shop. The additional cement work mentioned in these bills was work not shown on the plans. The omitted 12-2/3 cubic yards of concrete work was due to a change in plans made by the railway company. While the evidence as to the unit price agreement was objected to by the plaintiffs it is not contradicted by them.

After the concrete work on the project had been begun by the plaintiffs, the engineer of the railway company in charge of this project advised the defendants that according to his interpretation the plans and specifications did not require that the tracks outside the tank shop building should be laid in concrete; and no cement work was done in connection with the construction of the tracks outside and in rear of the tank shop.

The cement work for the project was completed by the plaintiffs to the satisfaction of the railway company; and it has settled with the defendants in full for the whole project in accordance with its contract with them, without making any deduction, or claim for any deduction, by reason of the fact that the tracks in rear of the tank shop were not laid in cement. The position of the railway company

was that the plans and specifications did not call for such cement work.

As the cement work progressed the defendants paid the plaintiffs for eighty per centum of the work completed each month. Nothing was said between the parties about a deduction from the contract price, on the ground that the tracks in rear of the tank shop did not have to be laid in cement, until after all the work had been completed and the plaintiffs and defendants came to have a final settlement. The defendants then made the claim that they were entitled to a deduction from the contract price because no concrete had to be, or was, laid for the tracks in rear of the tank shop. The plaintiffs refused to make such deduction, and brought this action to recover for the balance of the contract price which had not been paid to them, $2,115.38.

The trial court in overruling the demurrer in effect held that *quoad* the cement work, if any, to be done in connection with the construction of the tracks in rear of the tank shop the contract was a contract of hazard, and that the fact that this work did not have to be done did not bring it within the terms of the agreement between the parties as to a unit price for additional or omitted work. In these views we concur.

The contention most strongly argued here by the defendants is that the contract by them with the plaintiffs was based upon a mutual mistake of fact, in that both parties construed the plans and specifications as requiring that a section of each of the three tracks in rear of the tank shop should be laid in concrete seven feet six inches wide and sixteen inches thick, and was not a contract under which a hazard was assumed as to whether or not any concrete outside the tank shop would have to be laid for these tracks. The evidence, we think, does not support this contention.

The defendants cite us to the following cases which they contend support their contention that this was a case of a mutual mistake of fact, and not a case of a contract of hazard: *Briggs* v. *Watkins,* 112 Va. 14, 70 S. E. 551; *Vir-*

*ginia Iron, etc., Co.* v. *Graham,* 124 Va. 692, 98 S. E. 659. The facts of those cases are readily distinguishable from the case at bar; and what is said in them is not applicable to the state of facts here before us.

The evidence is that both parties were in doubt as to whether the plans and specifications required any part of the tracks in rear of the tank shop to be laid in concrete; and neither party professed to know whether the plans called for it or not. The quantity of concrete work for the tracks in rear of the tank shop which was included by the defendants in arriving at the amount of the bid submitted by them to the railway company, and also by the plaintiffs in arriving at the amount of their proposal to the defendants, was approximately 156 cubic yards (*i. e.,* 1,783 divided by twelve). If it be assumed that the plans and specifications required that the whole, or some parts, of the tracks in rear of the tank shop should be laid in concrete, 156 cubic yards does not check with any quantity of concrete work for these tracks which can be arrived at from a reading or construction of the plans and specifications.

 When these facts are taken in conjunction with the other facts shown by the evidence as it is above stated, they show that the defendants in making their bid to the railway company, and also the plaintiffs in making their proposal to the defendants, knew that they were accepting, and intended to accept, a hazard as to what, if any, concrete work had to be done outside the tank shop for the construction of these tracks; and that in making the estimates of quantities on which their several bids were made, they both included, more or less arbitrarily, 156 cubic yards of concrete to protect the bidder, at least in part, against the possible contingency that the plans might be construed to require some parts of the tracks in rear of the tank shop to be laid in concrete.

Where parties treat on the basis that any material fact which is the subject of the agreement is doubtful, and the consequent risk which each is to encounter is taken into

consideration in making the contract, one party is not entitled to be relieved from the contract because it turns out that the facts about the matter with reference to which they were in doubt are to the advantage of the other party. Mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk are not such mistakes of fact as entitle either party to relief. 3 Williston on Contracts, section 1543; 2 Pomeroy on Equity (4th ed.), section 855; 13 Corpus Juris, page 376, and cases there cited; *Perkins* v. *Gay,* 3 Serg. & R. (Pa.) 327, 8 Am. Dec. 653; *Denver & S. L. Ry. Co.* v. *Moffat Tunnel, etc., Dist.* (D. C.) 35 F. (2d), page 365, affirmed by (C. C. A.) 45 F. (2d) 715.

The agreement with reference to omitted work, when properly construed in the light of the facts of this case, covered work which, though called for by the plans and specifications, was not required to be done. The work here in question was not called for by the plans and specifications, and does not fall within the meaning of omitted work as used in this agreement.

The defense of failure of consideration is predicated upon the defendants' contention that there was a mutual mistake of fact against which they are entitled to relief. What has been said above on the question of mistake disposes also of this defense.

For the reasons stated, we think the judgment of the trial court upon the demurrer to the evidence was correct, and it is affirmed.

*Affirmed.*