## HERMAN v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 7211.

Circuit Court of Appeals, Third Circuit.
Dec. 21, 1939.

Arthur S. Arnold, of Philadelphia, Pa., for appellant.

Charles I. Thompson, of Philadelphia, Pa. (Louis W. Dawson, of New York City, and Ballard, Spahr, Andrews & Ingersoll, of Philadelphia, Pa., of counsel), for appellee.

MARIS, CLARK, and JONES, Circuit Judges.

CLARK, Circuit Judge.

The layman's sense of grievance is not (and this is axiomatic) coterminous with an invasion of his legal rights. By unfortunate hypothesis then, the aggrieved one must seek enlightenment from specialists skilled in the ascertainment of redressable as opposed to felt wrongs. Their advice, fortunately, is correct more often than not. In the case at bar, however, we feel that they have far exceeded the usual margin of error. The learned district judge was so strongly of our opinion that he granted defendant-appellee's motion to dismiss the complaint.

The plaintiff purchased some insurance from the defendant company in May 1932 for a single premium of $60,745.71. That insurance was in the form of a policy technically known as "Annuity Certain followed by Deferred Life Annuity", Record p. 9. The sale was made by a "duly authorized agent" who, in what might almost be called the duly authorized manner, presented his prospect with a rather complicated table of figures in five columns and an accompanying textual explanation. This table showed the insured how he could withdraw $300 a year for 19 years (duration of the annuity certain) to augment his guaranteed income of $3,300 and still be able to include in his coverage a five year retirement income contract to begin at the age of sixty-four. These withdrawals were to be made from the dividends which are a usual feature in mutual insurance contracts. Huebner, Life Insurance, p. 379. The dividend amounts are set forth in column one and in the following explanation their total appears under the caption "income from dividends per 1932 scale".

The plaintiff paid his premium, accepted his policy, and enjoyed its benefits for six years. At the end of that time, no doubt in a moment of depression, he compared the dividends he had received, $2,180.69, with the corresponding figures, $4,412.93, appearing in column one above referred to. He then seems to have emitted a figurative cry of distress at the discrepancy of $2,232.21 thus appearing. The cry was loud enough to arouse the sympathies of the defendant company and on September 16, 1938 they obliged their assured by entering into a new contract. This "arrangement", as, for some reason, plaintiff prefers to call it, provided for cancellation of the policy, on the one hand, and issuance of a new deferred life annuity policy and payment of $32,892.23 to the plaintiff, on the other. The new policy differed from the old in that it dropped out of the annuity certain provisions. Why the plaintiff should have accepted this policy in September and in November have his attorney (now of record in the case) write to the company and refer to it as "what purports to be a nonparticipating deferred annuity policy" is not clear. At any rate, the company clings to the belief that what they have issued is a policy and still holds that view in spite of plaintiff's present assertion by way of complaint.

The pleadings seem inadequate and confused. In fact, they amount to little more than their concluding phrase, "hence this suit". However that may be, we must so construe them "as to do substantial justice", Rules of Civil Procedure for District Courts, rule 8(f), 28 U.S.C.A. following § 723c, and do so in plaintiff-appellant's favor. He launches a double attack. That attack is, first, an assertion of misrepresentation and breach of promise as to the first policy, and, second, an allegation that the later policy is void for technical failure to comply with the insurance law of Pennsylvania.

The plaintiff had expectations and they did not transpire into facts. That may have been due to mistake on his part, on his and the insurance company's part,

or it may have been because of representations innocent or otherwise flowing from the insurance company to him. In any of these hypotheses (except perhaps, unilateral mistake, not known to the other party, 2 Restatement of Contracts, §§ 472, 476, 503), he is entitled to equitable rescission if he complies with the essential qualification that he proceed with reasonable promptness.

Let us inquire, first, with respect to existence or non-existence of facts necessary to support the hypotheses. We can dismiss, at once, mistake, whether mutual or unilateral. The mistakes relieved against do not lie in the field of prediction. They must be as to present and existing facts. Parker-Washington Co. v. Kansas City, Mo., 8 Cir., 40 F.2d 232; Denver & S. L. Ry. Co. v. Moffat Tunnel Improvement Dist., D.C., 35 F.2d 365, affirmed with immaterial modification, 10 Cir., 45 F.2d 715, 732, certiorari denied, 283 U.S. 837, 51 S.Ct. 485, 75 L.Ed. 1448; Metropolitan Life Ins. Co. v. Humphrey, 167 Tenn. 421, 70 S.W.2d 361; Fix v. Craighill, 160 Va. 742, 169 S.E. 598. We can also dismiss any idea of fraud and so of fraudulent representations. There is no assertion whatever that the agent acted in anything but the best of faith in submitting his columnar analysis. It will be noticed that the one phase where particularity of pleading is required under the new rules is "in all averments of fraud or mistake". Rules of Civil Procedure for District Courts, rule 9(b), 28 U.S.C.A. following § 723c.

Do these innocent (and here even non-negligent) but, in the event, mistaken figures furnish ground for rescission? The weight of authority does not stress the moral angle in granting rescission in equity at least. 5 Williston on Contracts, § 1500, p. 4189, 23 Am.Jur. § 134, p. 931, 17 C.J.S.; Contracts, § 147, page 502, and cases cited therein. There are, however, two reasons which on both principle and authority, fortunately, preclude recovery here. They each go to the character of the representation and in truth each one in substance makes the representation less than that. In other words, and in the terminology of the American Law Institute, the "misrepresentation" is rendered "immaterial". 2 Restatement of Contracts § 476(1).

Plainly all statements must be considered against their background. If that background precludes reliance by the recipient no wrong to him follows from their eventual unreliability. The preclusion here is not single but double. It arises, first, from the character of the insurance business and, second, from the difference between present fact and future prophecy. The cases hold, and sensibly, we think, that statements as to accumulations, dividends, surplus, etc., made in the sale of life insurance are mere illustrations or estimates and their subsequent inaccuracy is no ground for redress. Cf. 2 Restatement of Contracts § 470(2). They are collected in an excellent note in 22 A.L.R. 1284. As a Pennsylvania case there cited puts it:

" * * * He [the assistant secretary] said that, on a 15-year policy for $25,000, the insured beginning at the age of 41 would receive at the end of the term a paid-up policy for the same amount and an estimated sum of $7,800 in cash, and that, while they always put the word 'estimated' in, witness could rely on getting the amount named; that it was the rule of the company to be always on the safe side, and never to put out an inflated estimate. * * *

"Counsel for appellant contends that these statements of the assistant secretary of the company were misrepresentations of material facts, and that the company should be held responsible to him in damages for the deceit which he alleges was practiced. But with respect to this matter the trial judge found that the evidence of misrepresentation was not sufficiently clear, precise, and indubitable to demand a reformation of the policy, and that the misrepresentations were concerned with matters which were the subject of estimate merely, and not of concrete fact, and therefore they do not support the appellant's allegation of fraud in the making of the contract. He further held that it was not within the power of the assistant secretary to bind the defendant company by any representation, in such a manner as to give to the plaintiff any advantage over other policy holders in the company. The court also found that the representation made by the assistant secretary that the estimate was based on the past experience of the company did not constitute such deceit as would justify a recovery of damages by appellant, or would entitle him to an accounting by the company. These conclusions seem to us to reasonably fol-

low from the evidence concerning the matter in question." Grange v. Penn Mut. Life Ins. Co., 235 Pa. 320, 321, 84 A. 392, 396.

The cases also hold, and again sensibly, we think, that erroneous assertions of future fact are not actionable in the absence of a showing of knowledge of falseness, 23 Am.Jur. §§ 35, 36, pp. 794-798; 17 C. J.S., Contracts, § 157, page 509; cf. 2 Restatement of Contracts § 474. The decisions are further collected in the various Decennial Digests under the heading, Contracts, ☞94(6), see 8 Vale's Pennsylvania Digest, Contracts, ☞94(6), pages 584, 585. Of this, as we have said, there is no allegation.

Our interpretation avoids any question of the reasonable promptitude requisite to the right of rescission. The text books and writers make that, as the qualifying adjective suggests, a matter of the circumstances of each case. 17 C.J.S., Contracts, § 432, page 914; 5 Williston on Contracts § 1526, p. 4273, et seq.; 4 Cooley Briefs on Insurance (2d Ed.) 4711-4716; 2 Black, Rescission and Cancellation, § 478. Here the plaintiff discovered the alleged misrepresentation in 1933 when he received the first dividend in an amount some $150 less than column one predicted. He waited five years and received five more "short" dividends before demanding and obtaining his new and presumably more satisfactory policy. Even under the stricter English rule this would seem a pretty long time. A mutual insurance company must make calculations based on certainty and overhanging rescissions are not conducive to stability. However, the element of circumstance is difficult to appraise from the face of the pleadings and we need not do so.

We spoke earlier of the complaint's reference to "promise". It requires a strained construction to give the use of that word therein its ordinary meaning. This because the context indicates its selection in the same sense as its accompanying "statement" and "representation". Conceding, however, a broader meaning of warranty and the right to rescind for breach thereof, 5 Williston on Contracts § 1462, p. 4089, the plaintiff is no further forward. We have pointed out two fatal vices in the statement qua representation. It is probable that what we are about to mention constitutes an additional vice. But whether it does or not, it is an absolute bar to any action qua breach. 5 Williston on Contracts § 1630, p. 4560. Any such promise with respect to a life insurance contract in a mutual company is "illegal and void". The nature of mutuality prescribes it and we hardly need the explanation of the Pennsylvania Supreme Court in the case above cited. That court said: "It will not do to construe the contract in this case as an agreement by which the company·was bound to guarantee to appellant a certain definite amount of surplus. That was something which, from the circumstances, the future alone could determine. It depended, for one thing, largely upon the number of lapsed policies, which could not be foretold. The company is a mutual one, and in its accumulations all its policy holders had the right to share in the proportions fixed by the terms of their contracts. Whatever representation may have been made to appellant, he is and can be entitled to nothing more than his proportionate share of the surplus which actually accrued. It is obvious that a mutual insurance company cannot discriminate among its policy holders, and any agreement which would result in the payment of larger proportionate dividends to one of its policy holders than to others in the same class would be illegal and void." Grange v. Penn Mutual Life Ins. Co., 235 Pa. 320, 333, 84 A. 392, 396.

We question any real innocence on the part of plaintiff here. Dividend is a widely known technical term and is relative to problematical earnings and not absolute to the payment of fixed sums. See Kehl, Early American Dividend Law, 53 Harvard Law Review 36. Even assuming, however, a greater excusableness the public policy is, we think, against relief from the transaction, 17 C.J.S., Contracts, § 272, page 656. It might be noted that the right to rescind for breach of warranty is also subject to the laches rule. 5 Williston on Contracts, § 1463, p. 4092.

Since we have found no right of rescission of the original contract it is unnecessary to discuss the accord and satisfaction, if any, ensuant upon the issuance of the deferred annuity policy. The point seemed to us less fundamental and in the draftmanship of the complaint less clear. Its resolvement in our judgment depended largely on what effect can be given to an exhibit attached to the complaint. That particular exhibit (D., Rec-

ord p. 18) is a letter from plaintiff's counsel of record to defendant company, and considerable study on our part has not enabled us to fix its implications as a pleading (many of them self-stultifying) with sufficient precision.

 It is necessary, then, to deal with the suggested lack of technical validity of the deferred annuity policy. This suggestion emanates from no grievance of client but rather from ingenuity of counsel. In Pennsylvania, as in many other jurisdictions, the form and substance of insurance policies are subject to regulation. See, Patterson, Administrative Control of Insurance Policy Forms, 25 Columbia Law Review 253; Isaacs, The Standardizing of Contracts, 27 Yale Law Journal 34. No annuity policy may be issued without the formal approval of the Insurance Commissioner, and as so issued must contain in substance certain enumerated provisions. Nevertheless, policies lacking such approval are valid, though any clause in conflict with the required statutory provisions is ineffectual. Act July 17, 1935, P.L. 1116, § 410b, 40 P.S.Pa. § 510a. Issuance without approval is made "unlawful" (a misdemeanor) and a further penalty discretionary with the Commissioner is provided. Act May 28, 1937, P.L. 934, 40 P.S.Pa. § 477b. The allegation here is that the new policy is wanting in formal approval, nothing more. It is not suggested that the issued policy offends against the substantive prescription of the statute. By the same token there is nothing to show that the Commissioner's blessing would not have been conferred as of course or even that it could have been legally withheld. Cf. 40 P.S.Pa. § 509.

No stretch of our legal imagination can torture this circumstance into a nullification of the new policy. There is no trouble about explicit statutory voidness. Nor can the expressed validity of the contract work against public policy. The validating provision itself, invalidates all objectionable clauses regardless of approval. That, we are sure, is sufficient to punish the law breaking mens rea (but not inadvertence) as manifested in a civil court action. Cf. Fitzsimons v. Eagle Brewing Company, 3 Cir., 107 F.2d 712, November 24, 1939. The prohibition and penalty for mere non-approval stands on a distinct and much broader footing. It must reach inadvertence. For outside the court room, it is the only thing that protects the policy-holder ignorant of the law from the insurer insisting upon an unapproved and hence possibly illegal covenant. The New York Court of Appeals, construing a cognate statutory scheme, as applied to a far harsher circumstance, has flatly rejected the notion that an unapproved policy bears the stigma of illegality. Hopkins v. Connecticut General Life Ins. Co., 225 N.Y. 76, 121 N.E. 465, see also 32 C.J. 1108. It is interesting to observe that the Pennsylvania statutes we are proceeding under appear to be derived from those of New York. See 27 McKinney's Consolidated Laws of New York, c. 28, Insurance Law, §§ 53, 101, 101½ et seq.

It is hinted rather than argued that the 1937 penalty section impliedly repeals the 1935 validating section. Such a construction is only warranted where "a positive repugnancy" between the two provisions appears. See United States v. Borden Company, 60 S.Ct. 182, 84 L.Ed. ——, December 4, 1939. This ancient canon of statutory construction has been itself embalmed in a statute which sanctions implied repeal only where the two enactments are "irreconcilable". 46 P.S.Pa. § 591 and see § 566. Here, plainly, there is neither repugnancy nor irreconcilability. Civil enforcement rather than non-enforcement often can and does afford the more appropriate hindrance to harmful action. 5 Williston on Contracts § 1632, p. 4573. That hindrance may likewise be accomplished, as here, by statutory validity as opposed to voidness. And when a penalty is added to achieve the same end, there is no inconsistency between unlawfulness and validity. At any rate, the Pennsylvania legislature thinks so. See 40 P.S. Pa. § 659 (non-standard fire policy), 15 P.S.Pa. § 3144 (unlicensed foreign corporation).

 In conclusion we might call counsel's attention to Rule 12(e) of the new Rules. We have been constrained to attempt a rather elaborate opinion largely because the complaint seemed capable of varied interpretations. A resort to Rule 12(e) would, by definition, have resulted in the necessary certainty.

The judgment of the District Court is affirmed.