STANFA v. BYNUM et al.

No. 325 Civil Action.

District Court, W. D. Louisiana,
Monroe Division.

March 21, 1941.

amended petition has changed the action from one transitory in character to one local in nature. The prayer is now, in the alternative to the money judgment first sought, to enforce a legal or equitable lien upon the title to real or personal property within this district. Consequently, we hold that Judicial Code, § 57, 28 U.S.C.A. § 118, applies and the three defendants above must answer. Kentucky Coal Lands Co. v. Mineral Development Co., 6 Cir., 1914, 219 F. 45, 133 C.C.A. 151.

The plea to the jurisdiction is, therefore, overruled.

We now come to the motion to dismiss because no relief can be granted under the premises of the petition.

The statement of facts will be held to a narrative of the main and essential relations between the parties; the body of the opinion will elaborate quite fully this skeleton of facts.

On April 13, 1927, plaintiff leased from Charles E. Bynum, and his co-owners, a certain town lot in the city of Monroe, Louisiana, for a term of fifteen years from June 1, 1927. As permitted by this contract, plaintiff at his own expense erected three buildings on this lot, two in the year 1927, allegedly costing $10,500 and $6,000, and one early in the year 1929, costing $5,750.

The lease also provided that the lessors were given the privilege, at the expiration of the contract, to buy all improvements erected and placed on the lot by the lessee for one-half of the actual value of the improvements; the lessee was likewise given the privilege of removing all improvements erected by him at the expiration of the lease, provided all rentals were paid at the time of removal.

In 1934, plaintiff purchased from R. R. Guice certain ice-making machinery wholly on terms of credit, the purchase price being $4,500, represented by four promissory notes due October 15, 1934, July 15, 1935, October 15, 1935, and July 15, 1936. Guice retained a vendor's lien and chattel mortgage on the machinery for the total purchase price.

Plaintiff avers that Guice "in the summer of 1935 entered into an agreement with H. L. Sellers and Levi Houston for the purpose of getting rid of this plaintiff in connection with his ownership of the said machinery and buildings;" that they "consulted with Mr. Charles E. Bynum, and

William Estopinal, of Gulfport, Miss., and A. H. Reed, of New Orleans, La., for plaintiff.

Thompson & Thompson and Fink & Fink, all of Monroe, La., for defendants.

PORTERIE, District Judge.

First, we should pass on the plea to the jurisdiction filed by three of the defendants: Dorothy Schulze Stafford, a resident of Baton Rouge (Eastern District), La., Octavia Schulze Boswell, a resident of Bristol, Va., and William Schulze, a resident of Durham, N. C., based on the point that the original petition prays for a personal judgment. Stanfa is a resident of the state of Mississippi. The suit, therefore, is not "in the district of the residence of either the plaintiff or the defendant." Jud. Code, § 51, 28 U.S.C.A. § 112.

The plea to the jurisdiction was well founded at the time of its filing, but the

then and there formed a conspiracy to harass, intimidate, force and delay this plaintiff in the peaceful enjoyment of his said buildings and his ice-making machinery, and in deriving the rentals and benefits therefrom."

The monthly rent due by plaintiff to Bynum had become delinquent as well as notes payable to Guice for the machinery, and on December 27, 1935, defendants' attorneys wrote plaintiff making demand for payment of the indebtedness to Guice for the machinery and to Bynum for the rent past due.

On February 6, 1936, plaintiff agreed to sell the machinery to H. L. Sellers for the price of $10,650, payable in monthly instalments of $150, "and as a further consideration of the purchase price, a full and complete release from the said R. R. Guice of his claim of $4,500.00 in that part of the ice-making machinery that had been purchased from the said R. R. Guice by this plaintiff." Article 8 of petition. Plaintiff retained a vendor's lien for the unpaid purchase price. Sellers also leased from plaintiff the building in which the ice-making machinery was located at a monthly rental of $150, payable to Charles E. Bynum, the lot owner. Bynum, for himself and representing his co-lessors, consented to the sublease by plaintiff to Sellers, and joined in the sublease for the purpose of authorizing its execution by plaintiff.

The conspiracy, according to the petition, was hatched prior to the sale of the ice-making machinery by plaintiff to Sellers, and prior to the sublease by plaintiff to Sellers. There is no allegation, however, that plaintiff was forced or compelled by threat of physical violence, or influenced or induced by artifice, fraud and deceit to make said sale and sublease.

Sellers failed to make timely payment of the monthly instalments due on the machinery, and in September of 1936 plaintiff instituted suit in the state court, foreclosed his lien on the ice-making machinery, and again became the owner thereof. He subsequently sold it at private sale.

On December 23, 1936, plaintiff, in consideration of his release and discharge from the then accrued rent under the lease of April 13, 1927, amounting to $3,242.50, together with the rent to accrue during the unexpired portion of the lease term, more than five years, and the payment to him of $500 in cash, plus the assumption by lessors of certain obligations of the plaintiff, sold to defendants the buildings erected by him on the leased premises pursuant to the provisions of the lease of April 13, 1927. Plaintiff alleges that the bill of sale "was read to plaintiff and he was ordered, directed and forced to sign same over his protest under great threats of dire things that would be done to him and his property if he did not sign."

Plaintiff seeks damages for (a) loss of his ice-making machinery, in the sum of $11,000, (b) actual profits that would have been made in the operation of the ice factory, amounting to $79,500; (c) damages in the amount of $25,000 for mental pain and anguish that he suffered caused by the acts of oppression and conspiracy of all defendants, and (d) damages in the sum of $33,800 from the Conner heirs, being the amount arrived at by computation of future profits; or, alternatively, by the amended petition, that the supposed adjustment of December 23, 1936, be rescinded and set aside and that he be reinstated in the possession and use of all the property as under the original lease, and continued as such for the length and under the terms of that contract, etc.

It is clear, and not subject to any debate, that the plaintiff entered into the first relation with the defendants through the contract of April 13, 1927, willingly, and free of any duress or undue influence. These were promising and relatively prosperous days. The plaintiff might have built but one building and have satisfied the contract, but he was expansive while things looked good, applied no restraint to himself, and built three buildings on the premises; and for a number of years the venture proved well advised, for on building No. 1 he received $175 per month for two years, then $125 for three years, then $100 for one year, and then $75 per month for the remaining time; on building No. 2 he received $125 per month "for a long period of time;" in fact, until 1933, when the ice-machinery plant was installed in that building; and on building No. 3, costing, at plaintiff's own figures, only $5,750, he received $125 per month for several years. Plaintiff was receiving $425 a month from his building investment and, by his contract with the lot owner in 1927, was paying only $150 per month for the lot during the first ten years, leaving a net profit to him on his buildings of $275 a month.

Next, we should note in the consideration of this case that plaintiff had the use of the lot that he leased and of the buildings

that he erected on the lot from early in 1927 to the end of the year 1936—a period of nearly ten years.

The court takes judicial notice of the peak of supposed and misleading prosperity in the year of 1929, also, of the deep economic slough that followed, touching the very bottom about the year 1933. It is in the year 1933 that plaintiff's troubles began, rent payments became delinquent from then on, and, finally, foreclosure was mentioned in the letter of defendants' attorneys to plaintiff, as early as December 27, 1935.

There could have been no imposition, schemed or not schemed, upon the plaintiff, if, on the 23rd of December, 1936, the date of the settlement made between him and the defendants, he had had the small sum of $3,242.50. That was his rent in arrears. It took the relatively long period of twenty-two months for the rent, at $150 per month, to become overdue in that sum.

In the early years, when plaintiff's buildings were new and brought their best rental price, plaintiff should have accumulated a reserve in cash to meet the bad times; to offset the lower rental return due to deterioration of the buildings; or, in the alternative, should have kept the buildings in proper repair so as to maintain steadiness of rental return. This he did not do.

The only real allegations of fact showing fraud are contained in those articles of the petition connected with the seizure by plaintiff of the ice-making machinery, and, particularly, in connection with the adjudication of the ice-making machinery to a member of the sheriff's staff of deputies; but in Article 10 of the petition plaintiff shows that he entered the local state court and received full and prompt redress of whatever injustice had been done him, as title to the machinery was placed back in him. Finally, in the settlement of the relations between plaintiff and defendants by the contract of December 23, 1936, plaintiff retained title to the ice-making machinery, had the right to remove it from the premises and sell it at whatever price and to whomsoever he wished.

The court is of the opinion that the meetings and conversations between the owners of the land, the owner of the original title to the machinery, Guice, the subsequent owner of the ice-making machinery, Sellers, to whom plaintiff himself sold, indicate no fraud. These individuals met because of the situation created, which perforce needed adjustments and understandings.

Plaintiff Stanfa complains that he could not get the owners of the land to take action on the Sellers' rental notes and that this is an indication of conspiracy between the owners of the land and the lessee of the building containing the ice-making machinery. Stanfa was in direct obligation for the rent of the land. He has no cause of complaint because the owner of the land preferred to look to him than to be compelled to collect against a third person with whom he was in no direct relation.

We see no fraud perpetrated upon plaintiff when the petition is thoroughly analyzed, in view of the great change of values and of business conditions between the years of 1929 and 1933, and immediately thereafter. There are thousands of instances of like character that occurred in our nation at that period, when previous investments, apparently safe and promising at the time made, because of want of capital at the time of distress, became total losses, without hope of salvage. It is so easy to utter the cry of fraud under these conditions.

At no place in the petition do we find facts alleged to show unwarranted imposition upon the plaintiff, either based upon oral threats or upon physical violence. The facts are all stated in sums of money, and prove definitely that plaintiff needed but the relatively small sum of $3,242.50, when he is supposed to have been fraudulently forced to sign.

We gather that a $4,500 vendor's lien, declared as existing at the time that plaintiff purchased the ice-making machinery from Guice, was credited to plaintiff somewhere during the various transactions. This is declared in Article 8 of plaintiff's petition in the language previously quoted.

In the consideration of plaintiff's petition we have been controlled by the practical want of facts, excluding the conclusions of the pleader, to sustain fraud and by the principle contained in Rule 9(b), 28 U.S.C. A. following section 723c, reading, as follows: "Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." See Herman v. Mutual Insurance Co., 3 Cir., 108 F.2d 678, 127 A.L.R. 1458; also Kithcart v. Metropolitan Life

Insurance Co., 8 Cir., 38 F.2d 407, page 410, where the court said: "It is elementary that a bill of complaint charging fraud must set out with some degree of particularity the material facts claimed to constitute the fraud." Also, Zimmerman v. National Dairy Products Corporation, D. C., 30 F.Supp. 438.

We now approach that phase of plaintiff's petition wherein he pleads the lesion beyond moiety article of the Civil Code of Louisiana in connection with his final settlement with the defendants made on December 23, 1936.

To serve as a ready basis for the discussion of this phase of the case, we should quote Article 2589 of the Civil Code of Louisiana, in full: "If the vendor has been aggrieved for more than half the value of an immovable estate by him sold, he has the right to demand the rescission of the sale, even in case he had expressly abandoned the right of claiming such rescission, and declared that he gave to the purchaser the surplus of the thing's value."

Defendants, in their motion to dismiss, before entering into the discussion of whether the value of the thing sold compared to the price received therefor showed lesion beyond moiety, attack the application of the Code article on the point that the property sold herein is not of an immovable nature, that is, is not "an immovable estate."

In Book II of the Louisiana Civil Code, on the general subject "Of Things," Section 2, "Of Immovables," we have Articles 462 to 471, both inclusive. Article 464 should be quoted in full: "Lands and buildings or other constructions, whether they have their foundations in the soil or not, are immovable by their nature."

The court finds no fault with the several cases cited by the plaintiff, to-wit: Vaughn v. Kemp, 4 La.App. 682; Scardino v. Maggio, 15 La.App. 444, 131 So. 217; Bank of Terrebonne v. Engeron, La.App., 140 So. 58. They are in strict conformity with the language of Article 464 of our Code.

The question that we have is to give interpretation, in view of the requirements of the above articles, to the following two paragraphs, 3 and 4, of the original contract between the parties, to-wit:

"It is understood and agreed that the property herein leased is to be improved by said Lessee, and that at least one good building, having a brick and stucco front, shall be constructed thereon by the said Lessee at his own expense, free from encumbrance and it is further agreed that the Lessee shall pay all taxes on such improvements that he may make on said lot.

"It is further understood that the privilege is given to the Lessors herein of buying at the expiration of this lease all improvements at a price and consideration of one half (½) of the actual value of said improvements, and the lessors grant and give to the said lessee the privilege of removing all of the improvements at the expiration of the lease, provided all rentals shall have been paid at such time."

Because of Article 464 of our Code, may it be said that the parties are not permitted to contract in the language: "and the lessors grant and give to the said lessee the privilege of removing all of the improvements at the expiration of the lease, provided all rentals shall have been paid at such time."? We answer in the negative.

We believe by this specific contract that the parties declared these buildings to be movables, the declaration of Article 464 of our Code to the contrary notwithstanding. The mutual agreement in paragraph 4 is fair, because well-balanced; the first part, "that the privilege is given to the Lessors herein of buying at the expiration of this lease all improvements at a price and consideration of one half (½) of the actual value of said improvements", tends to protect one from the loss occasioned by having to remove the buildings.

The half of the actual value at the end of the lease is the measure, not the half of the original value. This fact is mentioned to show (a) that the owner of the lot, after all, did not have to pay such a large amount, and, consequently, (b) that the consideration of the final settlement was ample.

We hold that the property was by special contract deimmobilized, since we hold that Article 464 is only applicable to contracts where parties have remained silent on the character of the things sold.

In direct support of the above principle, we quote from the case of Lighting Fixture Supply Co. v. Fidelity Union Fire Insurance Co., 5 Cir., 55 F.2d 110, 112, as follows:

"A case analogous in its facts to the one at bar is Miller v. Michoud, 11 Rob. 225, decided by the Supreme Court of Louisiana in 1845, but which, so far as we have been

able to ascertain, has neither been overruled nor modified. In that case it appeared that buildings had been erected on leased land and then mortgaged by the tenant. At that time chattel mortgages were unknown to the law of Louisiana, and, with one or two exceptions, not material to this case, only immovables subject to alienation could be mortgaged. It was contended that, by reason of article 464, then No. 455, but identical in terms, that the buildings were immovable by nature and subject to be mortgaged. In construing article 464 (455), the court said: 'Art. 455 of our Code, referred to by the appellants' counsel, says that buildings, or other constructions, whether they have their foundations in the soil or not, are immovable by their nature. This is true, but they are immovable only in relation to the soil, with regard to the owner of the soil; but not in relation to the owner of the materials with which they have been erected.'

"There are other Louisiana cases cited by appellee, but we need not review them, except to say that they hold that structures actually movable do not become immovable by nature or destination when placed upon land by one not its owner. No question of the rights of third persons under the registration laws arose in these cases.

"It is apparent that article 464, as construed by the Supreme Court of Louisiana, merely creates a legal fiction, to be given effect or disregarded according to the facts in the case and the construction required in connection with other articles of the Code. There is no difference in the legal aspect between movable structures placed on land and movable fixtures put into a building. It may be considered that the court has held that fixtures installed in a building, whether firmly attached or not, are considered immovables only when placed in it by the owner, unless rights of innocent third persons intervene.

"Article 473 of the Civil Code La. provides: 'Things movable by their nature are such as may be carried from one place to another, whether they move by themselves, as cattle, or can not be removed without an extraneous power, as inanimate things.'

"A tenant has a right to remove fixtures placed in a leased building, whether they or the building are damaged thereby, under the provisions of article 2726. As to the tenant, they are movables.

"The conclusion follows that on the facts in this case the betterments and improvements insured were movables so long as appellant retained any interest in them, and the valued policy law of Louisiana has no application to the policy declared upon."

See, also, Lighting Fixture Supply Co. v. Pacific Fire Insurance Co., 176 La. 499, 502, 146 So. 35.

For the definition of "lesion" in our Code and its general significance, see Articles 1860, 1861, 1862, and 2589-2600.

■ The cases cited by plaintiff, of which the case of Smith v. Huie-Hodge Lumber Co., 123 La. 959, 49 So. 655, is the leading one, to the effect that the sale of standing timber on land, though the timber is by clear intention of the contracting parties to be severed from the soil, is the sale of an immovable and not the sale of a movable, are not applicable, because the Legislature by Act No. 188 of 1904 made a special condition in the sale of standing timber, though made with a view to its separation from the land, in calling it the sale of an immovable and consequently as such being open to attack for lesion beyond moiety. A reading of the leading case, supra, Judge Monroe organ of the court, clearly shows that the French commentators were unanimous in holding that "where standing timber is sold, in order to be separated from the soil (coupe de bois), it is a sale of movable property, and is not subject to attack for lesion." 123 La. at page 963, 49 So. at page 656. It is only by legislative enactment that the exception is made. To make an analogy here, we say that it is by the clear declaration of the contracting parties that the exception is made; that what is normally and legally accepted as an immovable—a building on a lot—becomes a movable.

Therefore, the attack based upon the doctrine of lesion beyond moiety, peculiar to Louisiana, cannot be sustained.

Accordingly, for all and any of the above reasons, we grant the motion to dismiss for the failure of plaintiff to state a claim for which relief can be granted. Judgment will be signed accordingly.