**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-1328, 14-1406
_____


ANABEL ZAHNER, by her agent Raymond E. Zahner;
ESTATE OF DONNA C. CLAYPOOLE, by Mitchell R.
Claypool, Executor; CONNIE L. SANNER, by her agent
Jamie R. Rybak,
 Appellants in No. 14-1328


v.


SECRETARY PENNSYLVANIA DEPARTMENT OF
HUMAN SERVICES,
 Appellants in No. 14-1406
_____


ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA
(D.C. Civ. No. 1-11-cv-00306)
District Judge:  Honorable Maurice B. Cohill, Jr.
_____


Argued November 19, 2014
_____


Before: MCKEE, *Chief Judge*, RENDELL, and SLOVITER,
*Circuit Judges*.

(Opinion Filed:  September 2, 2015)

René H. Reixach, Esq.   [**ARGUED**]
Woods Oviatt Gilman LLP
2 State Street
700 Crossroads Building
Rochester, NY 14614

Kemp C. Scales, Esq.
P.O. Box 346
Titusville, PA 16354
    *Counsel for Appellants/Cross-Appellees in 14-1328*

Jason W. Manne, Esq.   [**ARGUED**]
Manne Law Office
355 Fifth Avenue, Suite 411
P.O. Box 23297
Pittsburgh, PA 15222

Eugene K. Cuccarese, Esq.
Office of General Counsel
Department of Public Welfare
301 Fifth Avenue, Suite 430
Pittsburgh, PA. 15222
        *Counsel for Appellee, Cross-Appellant/Appellee*

Stephen H. Kaufman, Esq.
Eric J. Pelletier, Esq.
Revée M. Walters, Esq.
Offit Kurman, P.A.
8 Park Center Court, 2nd Floor
Owings Mills, MD 21117
        *Counsel for Amicus Appellant Fidelity &*
*Guaranty Life Insurance Company*

Ron M. Landsman, Esq.
Ron M. Landsman, P.A.
200-A Monroe Street, Suite 110
Rockville, MD 20850

Stanley M. Vasiliadis, Esq.
2551 Baglyos Circle, Suite A-14
Bethlehem, PA 18020

John William Callinan, Esq.
2052 Highway 35, Suite 103
Wall, NJ 07719
        *Counsel for Amicus Appellant National*
*Academy of Elder Law Attorneys,*
        *and its Pennsylvania and New Jersey Chapters*

―――――――――

OPINION

―――――――――

MCKEE, *Chief Judge*.

Anabel Zahner, Donna Claypoole, and Connie Sanner each applied for Medicaid institutional care coverage shortly after purchasing a short-term annuity. The Pennsylvania Department of Human Services ("DHS"), formerly the Department of Welfare, classified each of their annuities as a resource when determining Medicaid eligibility.[1] This classification meant that the value of each annuity precluded them from receiving Medicaid assistance and resulted in a penalty period of ineligibility. Each plaintiff responded by bringing an action against DHS. The District Court held that the plaintiffs' purchases of the short-term annuities were sham transactions intended only to shield resources from Medicaid calculations, and affirmed DHS's imposition of a period of Medicaid ineligibility. The District Court also held that, contrary to DHS's arguments, a Pennsylvania statute that purported to make all annuities assignable was preempted by federal law. This appeal followed.

We agree with the District Court's preemption analysis, but will reverse its ruling that the annuities are resources for the purposes of Medicaid eligibility.

## I. BACKGROUND

―――――――――

[1] The named plaintiff, Anabel Zahner, is deceased. Her claim is moot and she is no longer a party.

Although the life insurance and annuity company, ELCO Mutual Life and Annuity ("ELCO"), refers to these contracts as annuities, DHS argues that they do not qualify as annuities under statutes and regulations governing Medicaid. We therefore must decide whether these contracts are annuities for purposes of Medicaid eligibility. For the sake of convenience and simplicity we will refer to them as annuities throughout our discussion. Our use of that term does not influence or determine our analysis.

3

Donna Claypoole was admitted to a nursing home in December 2010; her husband remained in their home (a "community spouse"). In 2009 and 2010, Claypoole and her husband made gifts to family members totaling over $100,000, resulting in a period of Medicaid ineligibility. In August 2011, Claypoole's husband applied for an annuity for which he paid MetLife $45,000.00 in return for monthly payments of $760.20 for five years. Claypoole also purchased an annuity. She paid ELCO $84,874.08 in return for monthly payments of $6,100.22 for 14 months. Both contracts contained anti-assignment provisions. One purpose of the ELCO annuity was to pay for Claypoole's nursing home care during the period of Medicaid ineligibility that resulted from her large gifts to family members. DHS considered both annuities "resources" in calculating a new penalty period of ineligibility.

Connie Sanner entered a nursing home in March 2011 without a community spouse. In July 2011 she paid ELCO $53,700.00 in return for an annuity which paid her $4,499.17 per month for 12 months. Sanner had also made a large financial gift to her children which reduced her resources below the Medicaid limits and resulted in a period of Medicaid ineligibility. The purpose of the annuity was to pay for Sanner's nursing home care during that period of ineligibility. As with Claypoole, DHS counted Sanner's annuity as a "resource" in calculating a new penalty period of ineligibility.

Claypoole and Sanner brought these 42 U.S.C. § 1983 actions against DHS arguing that DHS acted illegally by counting the amount of their respective annuities as an available "resource" for purposes of Medicaid eligibility; their cases were consolidated by the District Court. The plaintiffs and DHS filed cross motions for summary judgment and the District Court partially granted each party's motion. The District Court held that the plaintiffs' purchases of the short-term annuities were sham transactions intended only to shield resources from the calculation of Medicaid eligibility. *Zahner ex rel. Zahner v. Mackereth*, Civ. Action No. 11-306, 2014 WL 198526, at *12-*13 (W.D. Pa. Jan. 16, 2014). The District Court treated the annuities as trust-like instruments,

4

or transfers of assets for less than fair market value, and permitted DHS to count their cost as resources in calculating Medicaid eligibility. *Id.* at \*14.

The District Court also ruled that a Pennsylvania statute that purported to make all annuities assignable was preempted by the federal Medicaid law because Congress specifically provided that, under certain circumstances, annuities are exempt from inclusion as an available resource for determinations of Medicaid eligibility. *Id.* at \*10. Under Pennsylvania law, the value of any annuity held by the Medicaid applicant or his or her community spouse was considered a countable resource in determining if the applicant qualified for Medicaid assistance. Accordingly, the District Court held that the nonassignability clause in Claypoole's husband's annuity with MetLife was valid and enforceable. That annuity therefore complied with the applicable federal statute and could not be counted as a resource in determining Claypoole's Medicaid eligibility. This appeal followed.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.    ANALYSIS

We review a district court's decision on summary judgment *de novo*. *See Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014) (citations omitted); *Allstate Settlement Corp. v. Rapid Settlements, Ltd*., 559 F.3d 164, 169 (3d Cir. 2009) (citations omitted). Questions of statutory interpretation are also reviewed *de novo*. *See Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014) (citations omitted); *Kaufman v. Allstate N.J. Ins. Co*., 561 F.3d 144, 151 (3d Cir. 2009) (citations omitted).

### A. WHEN DOES AN ANNUITY CONSTITUTE A "RESOURCE" FOR PURPOSES OF MEDICAID ELIGIBILTY?

---

[2] Two amici have filed briefs in support of the plaintiff-appellants. Fidelity & Guaranty Life Insurance Company and the National Academy of Elder Law Attorneys, Incorporated filed briefs arguing that the annuities should not be counted as resources for Medicaid eligibility.

Pennsylvania participates in the federal Medicaid Program established by Title XIX of the Social Security Act ("the Medicaid Act"). 42 U.S.C. § 1396, *et seq*. Under the Medicaid Act, states receive federal funding to dispense assistance to qualified needy individuals. "Congress has created a comprehensive system of asset-counting rules for determining who qualifies for Medicaid." *Lewis v. Alexander*, 685 F.3d 325, 332 (3d Cir. 2012). The rules are intended to limit Medicaid assistance to those deemed most in need of it, and to ensure that applicants' spouses are not impoverished by the eligibility requirements. Those eligibility requirements change with some regularity.

The Deficit Reduction Act of 2005 ("DRA"), Pub. L. 109-171, amended the Medicaid Act. The provisions of the DRA that are relevant here establish the "appropriate means by which an individual or couple can reduce excess resources without incurring penalties [for purposes of Medicaid eligibility]." Jeffrey A. Marshall, Matthew J. Parker, *A Guide to Medicaid Annuities for Pennsylvania Lawyers* at 4 (Nov. 19, 2009), *available at* http://www.paannuity.com/pdf/guide_to_dra_annuities.pdf. Financial planning often involves the purchase of annuities. "The purchase of the annuity spends down a couple's excess resources to the level required for the institutionalized spouse to become financially eligible for Medicaid/[Long-Term Care] benefits." *Id.*

DHS oversees Pennsylvania's Medicaid assistance in conjunction with federal regulations as Pennsylvania's regulatory body charged with administering Medicaid assistance throughout the State. The federal Centers for Medicare and Medicaid Services ("CMS") has developed a State Medicaid Manual that assists states in interpreting the complex labyrinth of statutory and regulatory requirements that govern receipt of Medicare and Medicaid benefits.[3] That manual "serves as the official [U.S. Health and Human

---

[3] In 2001, the Health Care Financing Administration became CMS. *See* Statement of Organization, 66 Fed. Reg. 35437-03 (July 5, 2001).

Services Department ("HHS")] interpretation of the [Medicaid] law and regulations[.]" *Pa., Dep't of Pub. Welfare v. HHS*, 647 F.3d 506, 509 (3d Cir. 2011). The portion of the State Medicaid Manual relevant to our inquiry, concerning trusts and annuities, "is commonly referred to as 'Transmittal 64.'" *Morris v. Okla. Dep't of Human Servs.,* 685 F.3d 925, 930 (10th Cir. 2012) (citing Health Care Fin. Admin., U.S. Dep't of Health & Human Servs., State Medicaid Manual 64 § 3258.11 (1994)).

As explained at the outset, this dispute results from DHS's decision to count Claypoole's and Sanner's annuities as resources in determining whether they qualified for Medicaid benefits. The issue arose because Congress created a "safe harbor" pursuant to which, certain annuities are not considered resources for purposes of Medicaid eligibility. Therefore, the value of such annuities does not disqualify those otherwise eligible for Medicaid assistance from Medicaid eligibility. *See* 42 U.S.C. § 1396p(c)(1)(F), (G)(ii). We must determine if the disputed annuities here are within this safe harbor and therefore sheltered from inclusion in the plaintiffs' assets.

The DRA establishes a four-part test for determining whether an annuity is included within the safe harbor and thus not counted as a resource. The annuity must (1) name the State as the remainder beneficiary, (2) be irrevocable and nonassignable, (3) be actuarially sound, and (4) provide for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments. *Id.*[4] These

---

[4] The relevant section of § 1396p reads:

[T]he term "assets" includes an annuity purchased by or on behalf of an annuitant who has applied for medical assistance with respect to nursing facility services or other long-term care services . . . unless . . . . the annuity . . . (I) is irrevocable and nonassignable; (II) is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration); and (III) provides for payments in equal amounts during the term of

7

requirements apply to all annuities purchased on or after February 8, 2006, including the disputed annuities here.

DHS first claims that the relatively short terms of these contracts disqualifies them from being "annuities." The DRA does not define "annuity." In 1995, the Supreme Court defined annuities for the purposes of determining whether a state's comptroller had the authority to allow banks, in addition to insurance companies, to sell annuities. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995). *NationsBank* defined annuities as "contracts under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary." *Id.* at 254. The Supreme Court explained that "annuities are widely recognized as . . . investment products." *Id.* at 259 (citations omitted).

DHS relies, in part, upon *Mackey v. Dep't of Human Servs.*, 289 Mich. App. 688 (2010), and *Miller v. State Dep't of Soc. & Rehab. Servs.*, 275 Kan. 349 (2003), to argue that the plaintiffs' annuities are not "annuities" under the DRA's safe harbor. In *Mackey*, the Court of Appeals of Michigan concluded that an "investment in a closely held L.L.C. rendered [a] transaction a transfer for less than fair market value." *Mackey*, 289 Mich. App. at 690. The Court determined that an arrangement between relatives to facilitate Medicaid eligibility was not a transfer for fair market value due to its terms, not merely because of the intent to facilitate Medicaid eligibility. However, *Mackey* is neither binding

---

the annuity, with no deferral and no balloon payments made.

42 U.S.C. § 1396p(c)(1)(G)(ii); *see also id.* § 1396p(c)(1)(F) (explaining that annuities can be used to dispose assets if "the State is named as the remainder beneficiary . . . for at least the total amount of medical assistance paid on behalf of the institutionalized individual . . . ."). *See generally Morris*, 685 F.3d at 928 ("A separate provision states that an annuity is not treated as an available resource for purposes of Medicaid eligibility if the annuity meets certain requirements." (citations omitted)).

8

authority, nor persuasive given the very different circumstances here. *Miller* is equally unpersuasive, and also not binding. There, the Kansas Supreme Court considered the effects of a support trust on Medicaid eligibility.[5] The Court concluded that, although a support trust is an asset that is available to the Medicaid applicant, the principal balance was not available on the record before the Court. Nevertheless, "for the purposes of Medicaid eligibility determination, [*Miller*] h[e]ld [that the Medicaid applicant] became a co-settlor of her husband's trust[]" because she would have been entitled to half of his estate if he had not put it in a trust because of their marriage. *Miller*, 275 Kan. at 359.

It is not disputed that each of the annuities here is a transfer of a sum of money in exchange for a series of payments, continuing for a fixed period. *NationsBank of N.C., N.A.*, 513 U.S. at 254. As noted at the outset, Claypoole paid ELCO $84,874.08 to receive equal monthly payments of $6,100.22 over a 14-month term, while Sanner paid ELCO $53,700.00 for monthly payments of $4,499.17 over a 12-month term.

Nevertheless, DHS argues, and the dissent agrees, that the contracts are not annuities because they are not investment products, as recognized in *NationsBank*. *See generally id.* at 259 (citations omitted). DHS notes that Claypoole and Sanner each paid a broker a $1,000 start-up fee. When that fee is added to the monthly return of each annuity, the cost of the annuity exceeds its return. However,

---

[5] "A support trust exists when the trustee is required to inquire into the basic support needs of the beneficiary and to provide for those needs." *Miller*, 275 Kan. at 400 (citation omitted). This is distinguished from a discretionary trust wherein the beneficiary has no legal right to require a trustee to use any part of the principal. Rather, the trustee has complete authority to withhold trust assets from the beneficiary in the exercise of the trustee's discretion and in the exercise of his or her fiduciary duties. Since the assets of a support trust must be available to the beneficiary for his or her support needs, the assets in such a trust are routinely considered to be available to the beneficiary and therefore can affect the beneficiary's eligibility for Medicaid assistance. *Id.*

nothing in *NationsBank* requires that an instrument *must* provide a certain rate of return to qualify as an "annuity." In addition, *NationsBank* does not suggest that fees incurred in acquiring an annuity are considered in calculating the annuity's return. Nor does DHS (or the dissent) point us to authority suggesting that fees and costs must be taken into account in calculating the value received for a transfer in the form of an annuity. The plaintiffs contend that the fee paid to a financial advisor is a cost entirely separate from the purchase price paid to the annuity company, especially when -- like a fee paid to an elder law attorney to develop a Medicaid eligibility plan -- such service helps ensure that the annuities purchased are Medicaid-compliant, and thus helps reduce the risk of litigation. Appellants Br. at 14 n.7. Furthermore, the statutes that control our inquiry do not require a positive rate of return as a prerequisite for being sheltered under the DRA safe harbor.

The dissent is also concerned that "[t]he short payback period for the annuities . . . precluded any meaningful return from an investment standpoint." Dissent Op. at 1-2. Yet, we see no reason why the relatively short-term of these instruments necessarily precludes viewing them as investments, and Congress has not foreclosed that possibility.[6]

---

[6] As an example, "Treasury bills, or T-bills, are a short-term investment in terms ranging from a few days to 26 weeks." Dave Kansas, *What is a Bond?*, Wall St. J., *available at* http://guides.wsj.com/personal-finance/investing/what-is-a-bond/. *See also* Min Zeng and Katy Burne, *Treasury Plans More Short-Term Debt*, Wall St. J., May 6, 2015, *available at* http://www.wsj.com/articles/treasury-plans-more-short-term-debt-1430966689 (discussing the market for short-term loans and short-term investments, including "Treasury bills, which mature in a year or less[]").

We certainly do not suggest that annuities such as the ones in dispute here are on the same investment footing as government obligations. Rather, we note the short term of the latter instruments only to underscore our point that the short term of an annuity should not preclude it from being considered an investment.

DHS next asks us to disallow any annuity that does not have a term of two years or more because Transmittal 64 uses the plural of "years" in its definition of an annuity. Transmittal 64 defines an annuity as "a right to receive fixed, periodic payments, either for life or a term of years." Transmittal 64, § 3259.1(A)(9). (Notably, this definition is similar to that in *NationsBank*. 513 U.S. at 254.) DHS's concern is that, if there is no floor, then the "the payback period timeframe" could be reduced to "contracts of two days, two hours, or even two seconds, and [still be] an 'annuity.'" Appellee Br. at 36.

Perhaps, as DHS argues, annuities lasting only for hours or a few days would be "sham transactions." *Id.* at 37 (citing *United States v. Wexler*, 31 F.3d 117 (3d Cir. 1994)). It is, however, difficult to imagine such instruments gaining a foothold in the marketplace. Moreover, annuities cannot be sold in Pennsylvania without first obtaining approval of the Commissioner of Insurance and we doubt that an annuity lasting two seconds, two hours, or two days would win approval. *See Herman v. Mut. Life Ins. Co. of N.Y.*, 108 F.2d 678, 682 (3d Cir. 1939) ("No annuity policy may be issued without the formal approval of the Insurance Commissioner[.]").

Other than DHS's concern for hypothetical, two-second annuities that are not before us, and the obvious problems they would create, DHS presents little else to support its tortured reading of Transmittal 64. In contrast to DHS's position, much of the authority the plaintiffs rely upon suggests that an annuity's term has no floor at all. *See* Appellants Reply Br. at 17 ("'An annuity is a sum paid yearly or at other specific times in return for the payment of a fixed sum.'" (quoting POMS SI 00830.160(A)(1)) [7]); *id.* at 5

---

[7] "POMS" refers to the Social Security Administration Program Operations Manual System. "The POMS is relevant in determining the meaning of terms for Medicaid purposes because the Medicaid rules for evaluating resources may be no more restrictive than those for [the Supplemental Security Income program]." Appellants Reply Br. at 17 n.3 (citing 42 U.S.C § 1396a(a)(10)(C)(i)(III); 42 U.S.C. § 1396a(r)(2)(A), (B)).

("'Although annuities for the community spouse must be actuarially sound -- that is, they must pay out during the community spouse's life expectancy -- and must name the state as a remainder beneficiary, <u>there are no other limitations on the time period in which annuities must pay out.</u>'") (emphasis added to original) (quoting U.S. Gov't Accountability Off., *Medicaid: Fin. Characteristics of Approved Applicants & Methods used to Reduce Assets to Qualify for Nursing Home Coverage*, at 32 (May 2014), *available at* http://www.gao.gov/assets/670/663417.pdf)).

The resolution of this question turns largely on the meaning of "term of years" as used in Transmittal 64. The tenth edition of *Black's Law Dictionary* defines "term of years" as:

> 1. A fixed period covering a precise number of years. – Also termed *tenancy for a term*. 2. *English law*. A fixed period covering less than a year, or a specified number of years and a fraction of a year. . . . "In effect, 'term of years' seems to mean any term having a fixed and certain duration as a minimum. Thus, in addition to a tenancy for a specified number of years . . ., such tenancies as a yearly tenancy or a weekly tenancy are 'terms of years' within the definition, for there is a minimum duration of a year or a week respectively . . . ."

*Black's Law Dictionary* 1699 (10th ed. 2014) (quoting Robert E. Megarry & M.P. Thompson, *A Manual of the Law of Real Property* 74 (6th ed. 1993)). The edition of *Black's Law Dictionary* in place when Transmittal 64 was published defines only "term *for* years," and does so as "[a]n *estate for years* and the *time* during which such estate is to be held are each called a 'term[.]'" *Black's Law Dictionary* 1470 (6th ed. 1992) (emphasis in original).[8] However, it fails to elaborate

---

[8] Notably, the sixth edition of *Black's Law Dictionary* defines "annuity" with the same language as Transmittal 64.

on an "estate for years." The previous edition of *Black's Law Dictionary* defined an "estates for years" as "embrac[ing] *all terms* limited to endure for a definite and ascertained period, however short or long the period may be; they embrace terms for a fixed number of weeks or months or for a single year, as well as for any definite number of years, however great." *Black's Law Dictionary* 492 (5th ed. 1981) (emphasis added).[9]

We agree that a "term of years" is merely "a term of art[.]" Appellants Br. at 18. It requires that the contract last for some "definite period of time, as opposed to an indefinite term [or] for life." *Id.* It thus stands in contrast to an indefinite period or an estate lasting for the duration of a person's life. The contracts here, lasting 12 and 14 months, fall within the legal meaning of a "term of years" as each contract permits multiple, periodic payments, over time, though not indefinitely, and not for a period that is coterminous with the annuitant's actual life. *See generally NationsBank of N.C., N.A.*, 513 U.S. at 254, 259-60. Clearly, if Congress intended to limit the safe harbor to annuities lasting two or more years, it would have been the height of simplicity to say so. We will not judicially amend Transmittal 64 by adding that requirement to the requirements Congress established for safe harbor treatment. Therefore, Claypoole's and Sanner's 14- and 12-month contracts with ELCO are for a term of years as is required by Transmittal 64.

DHS also challenges the length of these annuities on the grounds that, even if the plaintiffs' ELCO contracts are "annuities," they are still too short to be actuarially sound and therefore cannot benefit from the safe harbor. The dissent agrees.

---

*Compare Black's Law Dictionary* 90 (6th ed. 1992), *with* Transmittal 64, § 3259.1(A)(9).

[9] The phrase thus seems to connote an interest in property that is less than a fee simple interest, *Black's Law Dictionary* 615 (6th ed. 1992) ("Typically, [the] words 'fee simple' standing alone create an *absolute* estate in [the] devisee[.]" (emphasis in original)), or life estate, *id.* at 924 ("An estate whose duration is limited to the life of the party holding it, or some other person.").

Congress did not require any minimum term for an annuity to qualify under the safe harbor. *See* 42 U.S.C. § 1396p(c)(1)(F), (G)(ii) (listing the requirements). Rather, as noted above, the Medicaid Act limits the safe harbor to those annuities that are actuarially sound. 42 U.S.C. § 1396p(G)(ii)(II). Although the DRA does not define "actuarially sound," Congress specified that assets must have a repayment term that is "actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration [('SSA')).]" 42 U.S.C. § 1396p(c)(1)(I)(i).

Transmittal 64 adds: "[i]f the expected return on the annuity is *commensurate with* a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound." Transmittal 64, § 3258.9(B) (emphasis added). The "reasonable estimate of the life expectancy of the beneficiary" is determined using "life expectancy tables[] compiled [by] . . . the Office of the Actuary of the [SSA]." *Id.* Transmittal 64 further explains that "[t]he average number of years of expected life remaining for the individual must *coincide with* the life of the annuity." *Id.* (emphasis added). This requirement prevents individuals from purchasing annuities that will pay out to their heirs after the annuitant dies and thus prevent the state from recouping assets to compensate for the Medicaid benefits the annuitant received.[10]

---

[10] 42 U.S.C. § 1396p(c)(1)(F) provides:
[T]he purchase of an annuity shall be treated as the disposal of an asset for less than fair market value unless-- the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual under this subchapter; or the State is named as such a beneficiary in the second position after the community spouse or minor or disabled child and is named in the first position if such spouse or a representative of such child disposes of any such remainder for less than fair market value.

14

Neither the "commensurate with" nor the "coincide with" standard specifies a minimum term for an annuity nor requires a minimum ratio to the annuitant's actuarially determined life expectancy. The plain text merely provides a simple example that states that if an annuity is for a term of 10 years, it is not actuarially sound if the beneficiary's reasonable life expectancy is 6.98 years, but it is actuarially sound if the beneficiary's reasonable life expectancy is 14.96 years. *Id.* It compares the beneficiary's reasonable life expectancy with the term of the annuity, stating that when the term is shorter than the life expectancy, "the expected return on the annuity is *commensurate with* a reasonable estimate of the life expectancy of the beneficiary, [and] the annuity can be deemed actuarially sound." *Id.* (emphasis added). Notably, it does not discuss just how much shorter the annuity can be and still be considered actuarially sound.

The District Court concluded that these annuities satisfied Transmittal 64's requirement because the plaintiffs' "life expectancies were all greater than the terms of the annuities by a large margin[.]" *Zahner ex rel. Zahner*, 2014 WL 198526, at *12 (citation omitted). It noted that "[i]n this case the Plaintiffs' life expectancies ranged from six to ten years and the longest ELCO annuity was for a term of 18 months." *Id.* (citation omitted). It thus concluded that "the annuities may be considered actuarially sound . . . ." *Id.*

On appeal, DHS highlights the "reasonable estimate of the life expectancy" language in Transmittal 64 to assert that these annuities are too short to have any relationship to the life expectancies of these annuitants. Appellee Br. at 40. While DHS and the dissent agree that Transmittal 64 imposes a maximum term for an annuity (the reasonable life expectancy of the annuitant), DHS and the dissent seek to impose a kind of floating floor for the minimum term for an annuity to be actuarially sound. However, neither the DRA nor Transmittal 64 imposes one. Transmittal 64 merely refers to actuarially sound in a manner that ensures that the term of

Thus, the State is normally the first to take only if the annuitant has no direct descendants.

15

any annuity will not exceed the annuitant's life expectancy. Accordingly, we conclude that any attempt to fashion a rule that would create some minimum ratio between duration of an annuity and life expectancy would constitute an improper judicial amendment of the applicable statutes and regulations. It would be an additional requirement to those that Congress has already prescribed and result in very practical difficulties that can best be addressed by policy choices made by elected representatives and their appointees.

A given individual's life expectancy may be far less (or far more) than that suggested by the statistical prediction reflected in actuarial tables. This is exacerbated by the fact that the actuarial predictions in the SSA tables depend on only two variables: age and gender. *Id.* at 37 n.8. Such tables may well have predictive value when applied to a large number of individuals because demographic determinants of longevity are averaged over a large statistical sample. However, when applied to any given individual within that statistical universe, these generalized tables lose much of their predictive force because they ignore a variety of highly relevant factors, such as race, medical history, and income, which have been demonstrated to correlate with, and have an impact upon, longevity. *See, e.g.*, *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 709 (1978) ("Actuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex."); *United States v. Prevatte*, 66 F.3d 840, 848 (7th Cir. 1995) (Posner, J., concurring) ("[B]lack and [W]hite life expectancies differ greatly[.]"); *see also* Kathryn L. Moore, *Partial Privatization of Social Security: Assessing Its Effect on Women, Minorities, and Lower Income Workers*, 65 Mo. L. Rev. 341, 368-74 (2000) (discussing various characteristics that impact life expectancy).

Accordingly, "there is strategic decision making at the individual and subpopulation levels because demographic groups have different longevity rates and *individuals can often assess their own longevity*." Benjamin A. Templin, *Social Security Reform: Should The Retirement Age Be*

16

*Increased?*, 89 Or. L. Rev. 1179, 1199 (2011) (emphasis added) (footnotes omitted).[11]

Claypoole's situation exemplifies this and illustrates the inherent problems with judicial attempts to further limit the safe harbor with reference to the annuitant's actuarial life expectancy. Claypoole was 86 years old when she purchased a 14-month annuity. Although she then had a "reasonable life expectancy" of over six more years according to the prescribed actuarial tables, *Zahner ex rel. Zahner*, 2014 WL 198526, at *4, few people who reach the age of 86 could be faulted for measuring life expectancy in months rather than years and not assuming that they would live long enough to see their 92nd birthday. Moreover, it is not for this court to decide if Claypoole's decision to purchase an annuity that would only last for 14 months (rather than attempting to approximate the six years predicted by the SSA tables) was unreasonable in terms of her assumptions about her life expectancy.

Despite actuarial predictions, Claypoole did not have six more years to live. Rather, she died within two years of purchasing the contract -- only five months after her 14-month annuity expired. Appellants Br. at 20. We therefore must respectfully disagree with the dissent's suggestion that her annuity "[was] not remotely commensurate with [her] life expectanc[y]." Dissent Op. at 3. Her 14-month annuity was, in fact, far more commensurate with her actual life

---

[11] The longevity gaps by race and level of education have increased over time. S. Jay Olshansky, *et al.*, *Differences In Life Expectancy Due To Race & Educational Differences Are Widening, & Many May Not Catch Up*, 31 Health Aff. 1803 (2012), *available at* http://content.healthaffairs.org/content/31/8/1803.full.pdf+html; *see also* James E. Duggan, Robert Gillingham, John S. Greenless, *Mortality & Lifetime Income Evidence from Soc. Security Records*, U.S. Dep't of the Treasury, Econ. Pol'y Res. Paper Series, at 3 (2006), *available at* http://www.treasury.gov/resource-center/economic-policy/Documents/rp2007-01.pdf ("Our results give strong empirical support to a negative relationship between individual lifetime income and mortality.").

expectancy than the actuarial predictions contained in the SSA tables. The short-term annuity that she purchased ensured that she would be able to enjoy the benefit of her annuity while minimizing the possibility that it would outlast her and, therefore, be considered as a transfer of wealth.

We do not, of course, suggest that the statistical forecasts in actuarial tables must accurately reflect actual longevity of a given individual or that they must have some minimal level of accuracy before they can be relied upon. Such precision is not possible. We merely conclude that the difficult policy decisions that are endemic in the kind of problem exemplified by the disputed terms of these annuities must be left to legislators and the administrators they appoint. This is particularly true here since a contrary result would force us to graft an additional requirement onto the Medicaid Act.

The DRA and its regulations contain no other definition or example than one requiring that an annuity not be for a term that exceeds an annuitant's reasonable life expectancy. We therefore conclude that an annuity is actuarially sound for purposes of the safe harbor if its term is less than the annuitant's reasonable life expectancy. Transmittal 64, § 3258.9(B).[12] This result is consistent with

---

[12] DHS relies on a North Dakota Medicaid state plan that adds an 85% life-expectancy requirement. Appellee Br. at 41-42 (citing JA A273-76). But, as the plaintiffs note, there is "no evidence that CMS ever approved the Pennsylvania policy in question[,]" like it did in North Dakota. Appellants Reply Br. at 6. Nor does CMS approval necessarily establish compliance with legal requirements. *See, e.g.*, *Geston v. Anderson*, 729 F.3d 1077, 1079 (8th Cir. 2013) (striking down another aspect of North Dakota's plan that held that the "North Dakota statute under which the annuity had been deemed countable violates and is preempted by federal Medicaid law."). In addition, even the example provided in Transmittal 64 would not have satisfied the North Dakota requirement because it is only two-thirds of the individual's life expectancy -- far lower than 85%. Thus, we find North Dakota's requirement unpersuasive to analyzing the annuities in this case.

Transmittal 64 in that it discourages the purchase of annuities for terms that are so long that assets would pass to heirs and not be available to reimburse the State for the Medicaid assistance the annuitant received while alive.[13] It also avoids drawing an arbitrary line that would determine if one's own assessment of his or her life expectancy is reasonable. Here, for example, although DHS and the dissent suggest that Claypoole's annuity was for too short a period to be reasonably commensurate with her life expectancy, the term of that annuity was a much closer approximation of her longevity than was actuarially suggested.

Here, the District Court concluded that these annuities were actuarially sound because they did not exceed the annuitant's life expectancy. It held that "the word commensurate indicates a reasonable relatedness of the term of the annuity to the beneficiary's life expectancy." *Zahner ex rel. Zahner*, 2014 WL 198526, at *12. However, it went further and concluded that these annuities should not be excluded from the plaintiffs' resources because they did not pass the "sniff[]test." *Id.* The District Court failed to cite authority for its imposition of a "reasonably related" requirement or for its "sniff test." Instead, it discussed the policy issues supporting that result.[14] The District Court

---

[13] The National Academy of Elder Law Attorneys, Incorporated, amicus to the plaintiffs, points out that CMS originally used the term "actuarially sound" in 1994 in order to address a concern that the annuity would be paid to someone other than the annuitant. National Academy of Elder Law Attorneys, Inc. Br. at 4. In order to prevent this, CMS devised that if the annuity's term were shorter than the life expectancy of the beneficiary, the annuity would go to the beneficiary and not another party. *Id.* at 4, 31. The National Academy of Elder Law Attorneys, Incorporated argues that Congress took on this phrasing and meaning when it adopted the term "actuarially sound" in the DRA amendments. *Id.* at 30.

[14] The District Court failed to recognize countervailing policy considerations that weigh in favor of permitting short-term annuities like the ones used in this case. Shorter annuities make it possible for people with fewer assets to

reasoned that the key problem with these annuities is that they do not have "a scrupulous eye toward[] achieving a legitimate, non-shelter, purpose or at least have the appearance of such an investment." *Id.* at *13.[15]

While Transmittal 64 acknowledges that annuities "are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid[,]" Transmittal 64, § 3258.9(B), the policy it implements to address that problem does not focus on how short an annuity's term can be, it focuses on the maximum term. The publication states: "[i]n order to . . . capture those annuities which abusively shelter assets," courts assess the "ultimate purpose[.]" *Id.* It then narrowly defines a negative "ultimate purpose" as the transfer of assets for less than fair market value, which occurs when "the individual is not reasonably expected to live longer than the guarantee period of the annuity[.]" *Id.* Thus, it reiterates a bright-line rule requiring qualifying annuities to be shorter than the beneficiary's life expectancy. That is a policy choice and we should not disturb it.[16]

---

purchase annuities. Being able to purchase an annuity for multiple years requires a large upfront cost that aging, low-income individuals may not have access to. *See* Appellants Br. at 19-20 & n.8; National Academy of Elder Law Attorneys, Inc. Br. at 19-20 & n.37, 24-25. The need to exercise caution is even greater when adopting a particular policy that places those who are already disadvantaged in an even worse position vis-à-vis more affluent members of society -- especially because the text of the Medicaid Act does not support such a reading.

[15] Moreover, as an amicus notes, weaving such unguided subjectivity and discretion into the fabric of a highly regulated benefit, like Medicaid, by allowing the District Court's "sniff test," "is a recipe for a cash-strapped state with a delicate nose to deny otherwise deserving Medicaid applications on the grounds that it sniffed abuse." Fidelity & Guaranty Life Ins. Co. Br. at 25.

[16] This interpretation does not lead to the absurd result that DHS alleges based on its theoretical parade of horribles.

Thus, we do not believe that the annuitant's motive is determinative. *See James v. Richman*, 547 F.3d 214, 219 (3d Cir. 2008) ("[W]e do not create rules based on our own sense of the ultimate purpose of the law being interpreted, but rather seek to implement the purpose of Congress as expressed in the text of the statutes it passed." (citation omitted)). Although we are sympathetic to the concerns the dissent and DHS outline, Congress must resolve them. Absent legislative change, it is clear that "Congress has not revised the Medicaid statute to foreclose this option." *Morris*, 685 F.3d at 928, 934 (a case involving annuities purchased for non-institutionalized spouses recognizing that "the district court's concerns regarding the exploitation of what can only be described as a loophole in the Medicaid statutes[] [and] conclud[ing] that the problem can only be addressed by Congress."). "It is not the role of the court to compensate for an apparent legislative oversight by effectively rewriting a law to comport with one of the perceived or presumed purposes motivating its enactment." *Mertz ex rel. Mertz v. Houstoun*, 155 F. Supp. 2d 415, 428 (E.D. Pa. 2001) (footnote omitted); *see also Lewis*, 685 F.3d at 351 ("[W]hile preventing abuse is a laudable goal and one with which Congress may agree, that requirement is not reflected in the Medicaid statute."). "Policy rationales cannot prevail over the text of a statute." *Hughes v. McCarthy*, 734 F.3d 473, 480 (6th Cir. 2013) (quotation marks omitted).

Financial planning is inherent in the Medicaid scheme: annuities are not barred from the safe harbor, and the look-back period that considers gifts as resources for purposes of Medicaid assistance is of limited duration. Therefore, the definition of protected annuities is one best left to the policymakers in the legislative branch.

---

*First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir. 1999) ("[O]nly absurd results and 'the most extraordinary showing of contrary intentions' justify a limitation on the 'plain meaning' of the statutory language." (quoting *Garcia v. United States*, 469 U.S. 70, 75 (1984))).

## B. ARE THE ANNUITIES TRUSTS OR TRUST-LIKE?[17]

To the extent that an annuity is "trust-like," Transmittal 64 disallows the annuity from protection in the safe harbor and the annuity's value can be treated as resources that can disqualify an applicant for Medicaid assistance. *See* Transmittal 64, § 3258.9(B). DHS argues that these annuities should be treated as resources of the plaintiffs under this provision.

> Transmittal 64, § 3258.9(B) states, in relevant part:
> [i]n order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound. . . .
> If the individual is not reasonably expected to live longer than the guarantee period of the annuity, the individual will not receive fair market value for the annuity based on the projected return.

---

[17] Although we will conclude that the annuities are not trusts or trust-like, it is not clear that this is essential to our holding since we have already concluded that the annuities are in the safe harbor that Congress has defined. The DRA directs that annuities "*shall* be treated as the disposal of an asset for less than fair-market value unless" the annuity meets the requirements, as we have concluded they do here. 42 U.S.C. § 1396p(c)(1)(F) (emphasis added); *see also* Fidelity & Guaranty Life Ins. Co. Br. at 14 (noting that Transmittal 64 cannot supplant Congress's express definition of the test for compliant annuities because "42 U.S.C. § 1396p(c)(1)(G)(ii) <u>is</u> the statutory test for determining whether any annuity is an abusive asset shelter." (emphasis in original)).

*Id.* However, DHS's argument is circular because we have already explained why these annuities are actuarially sound and not a transfer of assets for less than fair market value. There are, however, other reasons to reject DHS's attempt to define these annuities as trust-like.

Congress provided that "[t]he term 'trust' includes any legal instrument or device that is similar to a trust but includes an annuity only to such extent and in such manner *as the [HHS] Secretary specifies*." 42 U.S.C. § 1396p(d)(6) (emphasis added). We agree with the plaintiffs that, "because the Secretary to date has not so specified, it follows that [the plaintiffs'] annuities cannot be treated as trusts." Appellants Br. at 11. In a brief that the HHS filed in the Court of Appeals for the Second Circuit, the HHS explicitly stated that "the Secretary has *not* so specified." Brief for the Amicus Curiae U.S. Dep't of Health & Human Servs., *Lopes v. Dep't of Social Servs.*, 10-3741-cv, at *11, n.5 (2d Cir. 2011) (emphasis added). This rejection was made in 2011, after the DRA and Transmittal 64 were in existence. *See also Geston v. Anderson*, 729 F.3d 1077, 1085 (8th Cir. 2013) ("[T]he Secretary has not so specified[.]" (quotation marks omitted)).

Although DHS acknowledges that Transmittal 64 predates the Medicaid Act, it asserts that Transmittal 64 is still the Secretary's reply to the statutory invitation to define when annuities are "trusts." Appellee Br. at 38-39; *see* Transmittal 64, § 3258.9(B) ("Section 1917(d)(6) [42 U.S.C. 1396p(d)(6)] provides that the term 'trust' includes an annuity to the extent and in such manner as the Secretary specifies. This subsection describes how annuities are treated under the trust/transfer provisions.").

Transmittal 64 does not present any support for treating these annuities as trust-like devices. As noted, it merely points back to the requirement that annuities must not be longer than an individual's reasonable life expectancy, by adding a new requirement that the annuity cannot constitute "a transfer of assets for less than fair market value." *Id.* Transmittal 64 defines an annuity with a fair market value in the same way it defines actuarial soundness. Given the text of the DRA and the language in Transmittal 64, these

23

annuities are actually sound for the reasons we have explained, just as the District Court found.

Moreover, these annuities cannot be equated with trusts because there is nothing akin to a fiduciary relationship between the annuitants and ELCO. *Id.*, § 3259.1(A)(l) (defining a trust as "any arrangement in which a grantor transfers property to a trustee or trustees with the intention that it be held, managed, or administered by the trustee(s) for the benefit of the grantor or certain designated individuals (beneficiaries)[]"); *see also id.*, § 3259.1(A)(2) (requiring "a grantor who transfers property to an individual or entity with fiduciary obligations"). ELCO is not under any fiduciary obligation to wisely invest plaintiffs' funds or even to preserve them as long as ELCO fulfills its contractual obligation to make regular monthly payments in the agreed amount for the term of the annuity. *See generally* Appellants Br. at 12-13; Fidelity & Guaranty Life Ins. Co. Br. at 4-5. ELCO's duty to annuitants is purely contractual, it is not fiduciary. Accordingly, we readily reject DHS's attempt to have us view these annuities as some form of trust.

## C. IS PENNSYLVANIA'S ANTIASSIGNMENT PROVISION PREEMPTED?

Under Pennsylvania law, all annuities are assignable. The relevant provision states:

> Any provision in any annuity . . . owned by an applicant or recipient of medical assistance[] . . . that has the effect of limiting the right of such owner to sell, transfer or assign the right to receive payments thereunder or restricts the right to change the designated beneficiary thereunder is void.

62 PA. CONS. STAT. ANN. § 441.6(b). Section 441.6(b), making annuities assignable by operation of law, applies to all annuities, regardless of who purchases them, either the Medicaid applicant who lives in a nursing home, like Claypoole or Sanner, or the community spouse, like Claypoole's husband.

24

As we have explained, under the Medicaid Act, an annuity held by the Medicaid applicant counts as an asset for purposes of qualifying for Medicaid unless it meets certain requirements. 42 U.S.C. § 1396p(c)(1)(F), (G). One requirement is that the annuity must not be assignable. *Id.* § 1396p(c)(1)(G)(ii)(I). Further, although a community spouse's resources can be counted in determining Medicaid eligibility, *id.* § 1396r-5(c)(2)(A), a community spouse's irrevocable, nonassignable annuities may not be treated as available resources. *James*, 547 F.3d at 218-19.

Thus, if § 441.6(b) controls, no Medicaid applicant or his or her spouse can exclude an annuity from being considered a resource for purposes of Medicaid eligibility because Pennsylvania makes all annuities assignable. Section 441.6(b) requires that all annuities are countable resources for the purposes of Medicaid eligibility determinations.

The District Court held that the Medicaid Act preempted Pennsylvania's statute and that the annuities had *valid* nonassignability clauses in compliance with the federal statute. *Zahner ex rel. Zahner*, 2014 WL 198526, at *8. On appeal, DHS argues that the federal law cannot preempt Pennsylvania's law because §§ 1396p(c)(1)(F) and (G) do not create an impermeable safe harbor. Appellee Br. at 31-33. Rather, according to DHS, federal law merely gives states the *option* of allowing annuities to be excluded, and Pennsylvania chose to not exercise that option by enacting § 441.6(b). *Id.* at 32. DHS also claims that our precedent mistakenly assumed that Pennsylvania generally allows anti-assignment provisions; and instead, Pennsylvania is able to clarify its public policy position against nonassignment clauses by enacting § 441.6(b). *Id.* at 28 (citations omitted).[18]

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. The Supremacy Clause preempts any state law that "interferes

---

[18] Our review of this issue is *de novo*. *In re Federal-Mogul Global*, 684 F.3d 355, 364 n.16 (3d Cir. 2012) (citation omitted).

with or is contrary to federal law[.]" *Free v. Bland*, 369 U.S. 663, 666 (1962) (citations omitted). There are different forms of preemption, but all agree that this dispute implicates conflict preemption. Conflict preemption occurs when it is impossible to comply with both the federal and state law. *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193 (3d Cir. 2013) (citations omitted). "Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Farina v. Nokia*, 625 F.3d 97, 115 (3d Cir. 2010) (quotation marks omitted).

States that elect to participate in the Medicaid program must comply with eligibility requirements set by the federal government. The Medicaid Act permits states to establish eligibility requirements that are more liberal than those of the federal government, however states may not create more restrictive requirements. 42 U.S.C. § 1396a(a)(10)(C)(i)(III). A state law is considered "no more restrictive" if "additional individuals may be eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance." *Id.* § 1396a(r)(2)(B). "[O]nce the state voluntarily accepts the conditions imposed by Congress, the Supremacy Clause obliges it to comply with federal requirements." *Lankford v. Sherman*, 451 F.3d 496, 510 (8th Cir. 2006) (citations omitted); *see also Lewis*, 685 F.3d at 332 ("No State is obligated to join Medicaid, but if they do join, they are subject to federal regulations governing its administration." (citation omitted)).

"[E]very exercise of statutory interpretation begins with an examination of the plain language of the statute. Where the statutory language is plain and unambiguous, further inquiry is not required." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) (citations omitted). Moreover, we must examine the totality of every statute and not unduly focus on some language to the exclusion of other statutory text. *Id.* ("[W]hen interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous."

(citations omitted)). We also note that, "[i]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005) (citations omitted); *see also MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479 (3d Cir. 2013). There is a presumption against preempting state law. *Farina*, 625 F.3d at 116 (citations omitted). Our inquiry is therefore controlled by the text of the Medicaid Act pertaining to the assignability of annuities, to the extent that the language is not ambiguous.

Congress clearly intended for some annuities to be considered resources for the purposes of Medicaid eligibility. However, it is equally clear that Congress did not intend that all annuities be considered. It therefore established the criteria that would allow Medicaid applicants to purchase annuities without fear of becoming ineligible for Medicaid assistance. One criterion Congress established for an annuity to not count as a Medicaid applicant's resource is that it must be nonassignable. 42 U.S.C. § 1396p(c)(1)(F), (G). This affords some protection for the community spouse. "Congress sought to protect community spouses from pauperization while preventing financially secure couples from obtaining Medicaid assistance. To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." *Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 480 (2002) (internal quotation marks omitted).

Congress also declared that, with some exceptions, "no income of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C. § 1396r-5(b)(1). Irrevocable, nonassignable annuities are income streams, not countable as resources against the institutionalized spouse's Medicaid eligibility. *James*, 547 F.3d at 218-19; *see also Geston*, 729 F.3d at 1083; *Lopes*, 696 F.3d at 188-89; *Morris*, 685 F.3d at 932-33; *Vieth v. Ohio Dep't of Job & Family Servs.*, 2009-Ohio-3748, at ¶ 34 (July 30, 2009).

Nevertheless, DHS invites us to read ambiguity into seemingly straightforward text and precedent by pointing to a

27

separate section of the DRA. That section reads: "Nothing in this subsection shall be construed as preventing a State from denying eligibility for medical assistance for an individual based on the income or resources derived from an annuity described in paragraph (1)[.]" 42 U.S.C. § 1396p(e)(4). DHS weaves an ambiguity into this provision by noting the DRA's use of "subsection" instead of "section." Appellee Br. at 25-26.

Section 1396p(e)(4) uses the term "subsection" in reference to subsection (e), which pertains to disclosure requirements. Thus, according to DHS, § 1396p(e)(4) "literally states only that nothing in the disclosure requirements shall prevent a State from treating an annuity as a resource." *Id.* To its credit, DHS acknowledges that this reading is "something of a non-sequitur since disclosure has nothing to do with whether an annuity is treated as a resource or not." *Id* at 26. Nevertheless, DHS asserts "[s]ubparagraph (e)(4) demonstrates that Congress intended that States be able to treat annuities as resources under certain circumstances, but whether that authority extends to annuities exempt from transfer of asset treatment under §§ 1396p(c)(1)(F) and (G) is uncertain." *Id.*

We agree that this reading is a non-sequitur and we disagree with DHS's strained interpretation of the DRA. We reiterate that these provisions of the Medicaid Act are "not ambiguous" and, "contrary to the [DHS]'s interpretation, § 1396p(e)(4) cannot be regarded as a basis by which it may deny eligibility for benefits where the annuity otherwise complies with the law." *Weatherbee ex rel. Vecchio v. Richman*, 351 Fed. App'x 786, 787 (3d Cir. 2009).

When the Medicaid Act is read as a whole, Congress's intent with respect to annuities is addressed clearly and consistently throughout. As discussed above, with respect to Medicaid applicants, §§ 1396p(c)(1)(F) and (G) make clear that annuities with certain characteristics, including nonassignability clauses, are *not* assets to be counted as resources for their Medicaid eligibility. Moreover, after reviewing the Medicaid Act and the Supplemental Security Income Program, we previously held that Congress intended to shield a community spouse's annuity from calculation of

the institutionalized spouse's Medicaid eligibility if the annuity is nonassignable and irrevocable. *James*, 547 F.3d at 218; *see also Geston*, 729 F.3d at 1083; *Lopes*, 696 F.3d at 184-85.

DHS seeks to undermine *James* by pointing out that (1) Congress passed the DRA after the annuities in *James* were purchased and added a half-a-loaf gifting prohibition and (2) Pennsylvania passed § 441.6(b) specifically seeking to undermine *James* in light of Pennsylvania's public policy against restraints on alienation. Appellee Br. at 28, 37-38. We find neither argument persuasive.

As discussed above, the DRA outlines the requirements for annuities purchased by a person who is seeking Medicaid eligibility. *James*, on the other hand, discusses annuities purchased by a community spouse. Moreover, all appellate courts that have discussed whether a community spouse's nonassignable annuity is a countable resource toward the institutionalized spouse's Medicaid eligibility have done so *after* changes to the DRA and have come to the same conclusion as *James*. *See Geston*, 729 F.3d at 1083; *Lopes*, 696 F.3d at 188-89; *Morris*, 685 F.3d at 932-33; *Vieth*, 2009-Ohio-3748, at ¶ 34.

More fundamentally, Pennsylvania cannot enact legislation that changes federal law (or binding judicial interpretation of federal law) with respect to annuities. *Marbury v. Madison*, 5 U.S. 137 (1803). In *Geston*, the Court of Appeals for the Eighth Circuit explained, "[i]f the State's public policy requires it to count as resources certain annuities that federal law excludes from the scope of resources that may be considered in making eligibility determinations, then the State's methodology is more restrictive than the federal methodology." *Id.* 729 F.3d at 1085-86 (citation omitted).[19]

---

[19] DHS mistakenly interprets *Geston v. Anderson* as supporting its position on preemption. *Geston* held that § 1396p(e)(4) "maintained the *status quo*[,]" and merely "clarifies that the new disclosure provisions do not restrict a State's authority to deny eligibility on the basis of an annuity where the State otherwise has authority to do so." 729 F.3d at

The Medicaid Act cannot reasonably be read to support DHS's contention that Congress intended to make protection of annuities optional. *See generally United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir. 1996) ("[C]ourts should disfavor interpretations of statutes that render language superfluous." (quotation marks omitted)).

Moreover, the argument here is akin to the dispute that we resolved in *Lewis v. Alexander*. There, we held that the Medicaid Act preempted parts of Section 9 of the Pennsylvania Act of 2005, 62 PA. STAT. ANN. § 1414, which sought to add Medicaid eligibility requirements for special needs trusts. 685 F.3d at 331. We explained that the Medicaid Act is a "complex and comprehensive system of asset-counting rules[]" in which "Congress rigorously dictates what assets shall count and what assets shall not count toward Medicaid eligibility." *Id.* at 344. *Lewis* rejected DHS's myopic attempts to create a gap in the Medicaid Act within which, states were free to legislate. We said: "focusing solely on the words '[t]his subsection' has caused [DHS] . . . to miss the forest for the trees." *Id.* at 343. Because Congress has "*actually legislated on th[e] precise class of asset*[]" at issue, *id.* at 344 (emphasis in original), further limitations from the state are preempted. No meaningful distinction can be drawn between the "rigorous system" of legislating trusts in *Lewis*, and the equally rigorous attempts to define when annuities can be considered for Medicaid eligibility. Thus, "it seems clear that Congress intended to create a purely binary system of classification: either a trust[, or, in this case, an annuity,] affects Medicaid eligibility or it does not." *Id.* at 344. Pennsylvania may not create more restrictive requirements. 42 U.S.C. 1396a(a)(10)(C)(i)(III).

## III. CONCLUSION

---

1084. The Court looked at the entirety of the statute and held: "where other provisions of law define annuity benefits as unearned income, § 1396p(e)(4) did not authorize States to recharacterize those benefits as resources." *Id.* That is precisely what DHS seeks to do here.

For the reasons set forth above, we will reverse the order of the District Court in part, and affirm the order in part.

## ZAHNER v. SECRETARY PENNSYLVANIA DEPARMENT HUMAN SERVICES

## Nos. 14-1328 and 14-1406

---

**RENDELL,** <u>Circuit Judge</u>, dissenting

I would affirm the District Court's ruling on the grounds that the annuities that Sanner and Claypoole purchased were not purchased for an investment purpose, but, rather, were purchased in order to qualify for benefits. In addition, they were not actuarially sound. Therefore, they should be counted as resources for the purpose of the Medicare eligibility determination as outlined in the DRA.

The State Medicaid Manual "serves as the official HHS interpretation of the law and regulations." *Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 647 F.3d 506, 509 (3d Cir. 2011). It specifically recognizes that annuities "are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid." Transmittal 64, § 3258.9(B). The Manual mandates that "a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value)." *Id.* We cannot ignore that language, and must therefore consider whether the annuities here were investments. Thus, I take issue with the majority's statement that motive is not determinative. It is an essential consideration. I conclude that the annuities were not investments. The short payback period for the annuities

1

purchased by Sanner and Claypoole, 12 months and 14 months, respectively, precluded any meaningful return from an investment standpoint. Furthermore, when the broker fees are included, the transactions actually lost money.[1] In other words, as DPW argues, these annuities "had no economic purpose other than qualifying plaintiffs for [Medicaid] benefits." (DPW Br. at 21.) The majority asserts that nothing requires annuities to be investment vehicles, but, indeed, that is their legitimate, common sense purpose. The majority even notes that they are "widely recognized" as "investment products." (Majority Op. at 8 (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 259 (1995)). But these annuities were not investment products.

Aside from the lack of investment purpose, these annuities also were not actuarially sound. As the majority notes, Congress indicated that an annuity will fit within the "safe harbor" if, inter alia, "the annuity . . . is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration)." 42 U.S.C. § 1396p(c)(1)(G)(ii)(II). The State Medicaid Manual provides that "[i]f the expected return on the annuity is *commensurate with* a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound. . . . The average number of years of

---

[1] Even without the fees, the $290.04 "return" on Sanner's investment of $53,700 and the $526.20 "return" on Claypoole's investment of $84,874.08 represent an annual rate of return on each annuity of approximately .05%, a miniscule return. (Appellants' Br. 14.)

2

expected life remaining for the individual *must coincide with the life of the annuity.*"   Transmittal 64, § 3258.9(B) (emphasis added).  Essentially, the Manual indicates that an annuity is "actuarially sound" when the individual's life expectancy is "commensurate with" or "coincide[s] with" the annuity term.  Neither Sanner nor Claypoole had annuities with terms that coincided with or were commensurate with their life expectancies.  In Sanner's case, her annuity term was 10.55% of her life expectancy and Claypoole's annuity term was 17.23% of her life expectancy.  These percentages are not remotely commensurate with their life expectancies.  We need not opine as to what percentage of life expectancy would be sufficient to satisfy this test, but these percentages clearly miss the mark.

The majority concludes that an annuity with a term that is less than the annuitant's life expectancy passes the actuarial soundness test.  I disagree.  If Congress simply wanted to require the annuity terms to be shorter than life expectancy, it could have expressly stated that.  Instead, Congress said that annuities must be actuarially sound, and the State Medicaid Manual defines that term as meaning that annuities must be commensurate with or coincide with life expectancy.  Those words must mean something.  Moreover, the "commensurate with" requirement makes sense from a policy standpoint.  If an annuity term exceeds life expectancy, then it is clearly an attempt to transfer assets to others without facing Medicaid penalties.  And similarly, an annuity that is a tiny fraction of life expectancy has no investment purpose and operates only to shield assets.  Thus, actuarial soundness is the proper test to avoid both these undesirable situations, by requiring the term to be commensurate with life expectancy.

3

Because I would hold that the annuities were not for a legitimate economic purpose and were not actuarially sound, I would not reach the question of whether the provision of Pennsylvania law regarding non-assignability, § 441.6(b), is preempted.

Accordingly, I must disagree with the majority and would affirm.